(No. 6464.   August 2, 1937.)

L. F. JAUSSAUD and LOUISE JAUSSAUD, His Wife, and L. J. JAUSSAUD and ALICE JAUSSAUD, His Wife, Respondents, v. H. F. SAMUELS and ADA J. SAMUELS, His Wife, Appellants.

[71 Pac. (2d) 426.]

192

H. F. Samuels, in person, and Maurice H. Greene and W. S. Hawkins, for Appellants.

N. D. Wernette and Robert E. Brown, for Respondents.

MORGAN, C. J.—In the transcript and briefs the names of the parties have not been stated in the order prescribed by Supreme Court Rule No. 37, which requires: "The original title, with the names of the parties in the same order, shall be retained in this court, substituting for the words plaintiff or defendant, appellant or respondent, as the case may be." The title has been reformed to conform to that rule.

Prior to February 13, 1928, appellants were the owners of a tract of more than 9,000 acres of land in Bonner county. That day they mortgaged it to E. H. & W. C. Dewey Investment Company, a corporation, to secure the payment of their promissory note, payable to said corporation, ninety days after date, for $25,000, together with interest thereon at the rate of 8 per cent per annum. They further secured the payment of the note by chattel mortgage on livestock, farm machinery and equipment and by pledge of corporate bonds and stocks.

July 1, 1928, appellants executed a second mortgage on the land in favor of First National Bank of Sandpoint and Bonner County National Bank, jointly, to secure the payment of $6,000 to each of them, together with interest thereon at the rate of 7 per cent per annum.

October 8, 1929, the mortgagees, named in the first mortgage and in the chattel mortgage, for the consideration of $22,500, sold and assigned them together with the debt thereby secured, to First National Bank of Sandpoint. In that transaction the bank acted as trustee for T. J. Humbird and H. C. Culver, each of whom furnished one-half the purchase price.

The second mortgage was foreclosed and the property was sold to First National Bank of Sandpoint and Bonner County National Bank to satisfy the indebtedness thereby secured. Thereafter First National Bank assigned its interest to Bonner County National Bank and, March 31, 1934, a sheriff's deed was issued conveying the property to the latter bank.

Culver assigned his interest in the first mortgage to Spokane and Eastern Trust Company, hereinafter called the trust company, in trust, and, September 30, 1935, First National Bank of Sandpoint assigned and transferred the first mortgage to Humbird and the trust company, as trustee for Culver. It appears the pledged bonds and stocks, or that portion thereof which had not been sold and applied toward the payment of the indebtedness, also came into the possession of Humbird and the trust company, as trustee for Culver, as further security for the debt secured by the first mortgage.

Prior to the execution of either of the mortgages, the state had laid out and constructed a highway across the land and had taken and occupied thirty-five acres of it for highway purposes. The land used for highway purposes was expressly excepted from the mortgages.

In a contract dated April 24, 1935, executed by Humbird and the trust company, referred to as the grantors, wherein L. J. Jaussaud and L. F. Jaussaud, are referred to as the grantees, it is recited:

"The grantors hold property in Bonner County, Idaho, subject to conditions in the agreement hereunto attached, which was executed by T. J. Humbird, the Spokane and Eastern Trust Company, as Trustee for H. C. Culver, the Bonner County National Bank, of Sandpoint, Idaho, and H. F. Samuels. That agreement is hereinafter referred to as the Samuels agreement.

"The grantors and Mr. Samuels as of this date have leased the premises to the grantees for the term ending November 1, 1935, at a cash rental of Twenty Four Hundred ($2,400) Dollars, receipt whereof is hereby acknowledged. The lease is subject to all the terms of the Samuels agreement.

"The grantees desire an option to purchase the interest of the grantors in the premises subject to the conditions of the Samuels agreement. In consideration of Twenty Six Hundred ($2,600) Dollars (receipt of which by the grantors is hereby acknowledged) the grantors give unto the grantees an option until October 1, 1935, to purchase the interest of the grantors in the premises subject to the conditions of the Samuels agreement, on the following terms:

"The option price is Twenty Six Thousand Five Hundred Sixty Two Dollars Fifty Cents ($26,562.50), plus interest on Thirty One Thousand Five Hundred Sixty Two Dollars Fifty Cents ($31,562.50) at 8% per annum from February 1, 1935, plus any sums paid by the grantors by way of insurance or taxes or for the protection or betterment of the property. The option price is payable to the grantors at the office of the Spokane and Eastern Trust Company in Spokane, Washington, on or before October 1, 1935.

"So long as any rights granted to Mr. Samuels under the Samuels agreement shall survive, on exercising this option the grantees shall take merely such rights as the grantors then possess. If any property shall have been sold or leased by the grantors, under authority of the Samuels agreement, then payments therefrom received by the grantors shall be credited on the price at which the grantees hold this option. If on or before July 1, 1935, Mr. Samuels may exercise his option of purchase as set forth in the Samuels agreement, then the grantees may renounce the option herewith given to them, whereupon the sum of Twenty Six Hundred ($2,600) Dollars paid by them for the option shall be returned to them by the grantors.

"If the grantees shall not exercise this option on or before October 1, 1935, then all the interests that they have or might have under this option shall terminate and all sums theretofore paid by them to the grantors shall be retained by the grantors as a consideration for having granted this option. Time is of the essence.

"No right of any kind, except possession under the lease, shall accrue or vest in favor of the grantees until they shall have made full payment by October 1, 1935.

"On such payment on or before such date, the grantors shall convey to the grantees by quit claim deed such of the property as they may then hold subject to the obligations imposed on them by the Samuels agreement. The grantors shall also assign all the interest of the grantors arising under that agreement and shall likewise release of record the mortgage referred to in that agreement.

"It is the intention of the parties that this option, if exercised by the grantees, shall give them the right to purchase

only such property and such title therein as the grantors at the time may have, and that the grantors make no representation or warranty concerning the quantity or quality of the said lands nor their title thereto."

Attached to that contract is the following, therein referred to as the Samuels agreement:

"PART I

"T. J. Humbird and the Spokane and Eastern Trust Company, as Trustee for H. C. Culver, are the beneficial owners of a mortgage for $22,500, covering the Samuels land in Bonner County, Idaho. The mortgage stands of record in the name of the First National Bank of Sandpoint, as Trustee. Interest since February 1, 1930, at 8%, is in default. Taxes approximating $12,000 are also in default.

"The legal title is held by the Bonner County National Bank of Sandpoint, Idaho. The mortgagees recently commenced proceedings for foreclosure on account of the defaults.

"The State of Idaho now occupies 35 acres of the land for a highway to which it does not hold title. The State also desires to purchase seven acres as additional right of way and to adjust a claim for damages on account of a gravel pit heretofore occupied by it. The State has offered to pay $1,500 for deeds and acquittances, provided that it can get title from the Bonner County National Bank and partial releases from the first mortgage. The Bonner County National Bank has offered to deed the property to the mortgagees in consideration of $1,325 to be received from the State of Idaho. The mortgagees have consented to execute partial release of their mortgage and to permit payment of $1,325 to the Bonner County Bank in consideration of the issuance of the deed by the Bonner County Bank to the mortgagee. The additional sum of $175, which will be received by the Bonner County Bank from the State of Idaho in the transaction, will be applied on the mortgage debt. The Bonner County Bank will furnish to the mortgagees abstract evidencing its title to the premises, and the mortgagees will execute partial release and accept a deed from the Bonner County Bank on the foregoing conditions whenever counsel for the mortgagees has advised that a good title, subject only to the mortgage and taxes, is

conveyed by the deed from the Bonner County National Bank.

"It is understood that the deed from the Bonner County Bank to the mortgagees shall not constitute a merger.

## "PART II

"H. F. Samuels has no interest, legal or equitable, in the premises, but desires to purchase the property. The property, which is subject to this option, shall include such part of the premises as may be owned by the vendors at the time the option is exercised. The option price shall be reduced by sums received by the vendors on account of any sales or leases made by them. If any property shall have been sold before the exercise of the option, it shall be excluded from the option and if the vendors shall have sold any property but shall have retained any mortgage or contract or other evidence of interest, such mortgage or contract or other evidence of interest shall be included in the property to be delivered under the terms of this option.

"It is specifically understood that the identity of the property covered by this option may change from time to time and may be diminished in accordance with the rights reserved by the vendors. Mr. Samuels shall never have any right to demand performance under the option, except to claim credit against the option price for moneys actually received by the vendors, and to claim delivery of any property at the time being retained by the vendors, under the operation of this agreement.

"The option price is fixed at $31,562.50, with interest at 8% per annum from February 1, 1935, together with any sums paid by the vendors by way of insurance or taxes or for the protection or betterment of the property. The vendors do not covenant to pay any taxes now or hereafter levied against the property, nor to protect the property from sale on account of taxes, but if they shall elect to make any payment on account of such taxes, the amount so paid by them shall be added to the option price. All advances shall bear interest at the rate of 8% per annum.

"The vendors shall have the right to sell any property at any time, at any price, on any terms satisfactory to them, provided that prior to July 1, 1935, sales shall be confined to

Sections 16 and 17, and to any property located east of the Spokane International Railway right of way. After July 1, 1935, the vendors shall have the right to sell any property wheresoever located in their discretion at prices and on terms satisfactory to them.

"During the life of this option Mr. Samuels may occupy the dwelling heretofore occupied by him as a residence and may farm not exceeding 200 contiguous acres, so long as such farming is done directly by him. He shall not have any right to rent or lease any part of the premises. Except for the rights of possession herein described, he shall have no right of possession to any part of the property.

"The vendors shall have the right to lease any other property on terms and conditions satisfactory to them.

"If by July 1, 1935, Mr. Samuels shall have made payments under this option to the extent of $10,000, then his option shall be extended to January 1, 1936. If he shall not have made payment of $10,000, his option shall forthwith cease and terminate without notice.

"If by July 1, 1935, he shall have made payment to the extent of $10,000, then his option shall be extended to January 1, 1936. If by January 1, 1936, he shall have paid the further sum of $10,000 on account of this option, then his option shall be extended until July 1, 1936. If he shall not have made the second payment of $10,000 by January 1, 1936, then his option shall cease and terminate without notice. If by July 1, 1936, he shall not have made payment of the entire balance due under this option, then his option shall cease and terminate without notice.

"Payments of money received by the vendors on account of the sales or leases of any of the lands covered under this option shall be treated as payments on account for the benefit of Mr. Samuels.

"This is a unilateral contract and imposes no obligation of payment on Mr. Samuels.

"This is not an instrument that is entitled to be recorded and if it shall be recorded by Mr. Samuels, or with his consent or connivance, the option shall forthwith cease and terminate. If this option shall ever be terminated, all payments received by the vendors shall be forfeited as liquidated dam-

ages. Mr. Samuels agrees never to make any claim for all or any part thereof. If any commissions or expenses shall be paid by the vendors on account of any sales or leases executed by them, such commissions and expenses shall be deducted from moneys received by them before making credit to Mr. Samuels on the option price.

"If Mr. Samuels shall exercise this option, the vendors shall deliver quit claim deed and assignments covering such part of the property as they may possess at the time the option is exercised.

"Time is of the essence."

This document was executed by Humbird, the trust company, Bonner County National Bank and H. F. Samuels.

Bonner County National Bank conveyed the land involved herein to Humbird and the trust company, as trustee, subject to taxes and to the first mortgage above mentioned. That deed, according to an uncertified copy thereof, substituted for the original in evidence, appears to have been dated September 27, 1930. We suspect that date is erroneous. The instrument is certified to have been acknowledged September 28, 1935, and it seems to be probable, from that circumstance and from the fact that the sheriff's deed by which Bonner County National Bank acquired title to the property is dated March 31, 1934, the true date of the deed from the bank to Humbird and Spokane and Eastern Trust Company is September 27, 1935. By an instrument entitled "quit claim deed," dated September 19, 1935, Humbird and his wife and the trust company, as trustee, quitclaimed to L. J. Jaussaud and L. F. Jaussaud "all right, title and interest they may have in and to the following real property in Bonner County, State of Idaho:" Then follows a description of the land involved in this action. The deed further recites:

"In so far as the vendors may or might have any lien against these lands on account of a mortgage executed by H. F. Samuels and Ada J. Samuels, dated February 13, 1928, recorded in Book 20 of Mortgages, page 371, Records of Bonner County, Idaho, such lien is hereby released."

In view of the uncertainty of the record as to the date of the conveyance from Bonner County National Bank to Humbird and the trust company, we will not venture upon a dis-

cussion of the efficiency of their quitclaim deed to respondents to pass an after-acquired title (18 C. J. 314, sec. 299), but will proceed on the theory that, prior to executing and delivering the quitclaim deed to respondents, the grantors therein named had received the deed from Bonner County National Bank.

Appellants contend the consideration for the deed to the land from Bonner County National Bank and the trust company, trustee, was paid with their money and that when it was paid a trust resulted whereby the title was held for them. This contention is sound. The state took possession of thirty-five acres of their land and occupied and used it for highway purposes, prior to the making of either mortgage. The land so occupied and used was expressly excepted from both mortgages, so the $1,325, paid by the state, was for property of appellants and the money belonged to them. It was used to pay the consideration for the deed from Bonner County National Bank to Humbird and the trust company, and when it was paid, appellants became the equitable owners of the land and the legal title to it was held in trust for them. (*Reid v. Keator*, 55 Ida. 172, 39 Pac. (2d) 926.)

It is appellants' further contention that the transaction evidenced by the contract, referred to as the "Samuels agreement," and the deed from Bonner County National Bank to Humbird and the trust company were intended to secure the payment of the indebtedness evidenced by their promissory note, originally secured by the first mortgage on the land and a chattel mortgage on livestock, farm machinery and equipment, and by a pledge of bonds and stocks; that said deed and contract should be construed together; that they do not constitute an absolute conveyance, but a mortgage, in the nature of a renewal of the first mortgage, given to further secure the payment of said indebtedness.

In approaching this question, we are not unmindful of the rule that findings of fact made by a trial judge from conflicting testimony will not be disturbed on appeal if the testimony tending to support them would be sufficient to do so if uncontradicted. That rule, however, has no application to this case. The evidence on this point is nearly all documentary, and the little which is not is undisputed. (*Can-*

*non v. Seyboldt*, 55 Ida. 796, 48 Pac. (2d) 406), and cases therein cited on this point.)

I. C. A., sections 44–804 and 44–805 are as follows:

44–804. "Every transfer of an interest in property other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage, except when in the case of personal property it is accompanied by an actual change of possession, in which case it is to be deemed a pledge.

44–805. "The fact that a transfer was made subject to defeasance on a condition, may, for the purpose of showing such transfer to be a mortgage, be proved (except as against a subsequent purchaser or encumbrancer for value and without notice), though the fact does not appear by the terms of the instrument."

The record conclusively shows respondents had full knowledge of the claims of appellants to the land when they took the quitclaim deed.

■■ It is settled law of this state that a deed, absolute in form, the terms of which are not ambiguous, may constitute a mortgage. (*Investors' Mtg. Security Co. v. Hamilton*, 51 Ida. 113, 4 Pac. (2d) 347.) In that case it is said:

"It is also settled law that a mortgagor subsequent to executing the mortgage may sell his equity of redemption to the mortgagee; that is, a mortgagee may legally take a deed transferring the mortgaged property in satisfaction of the debt and legally give an option to purchase back. (*Shaner v. Rathdrum State Bank*, 29 Ida. 576, 161 Pac. 90.)

"In determining whether the instrument is a conveyance or a mortgage, the controlling question is whether or not the debt is paid on execution and delivery of the deed. If paid there is no mortgage and the deed can evidence only an absolute transfer. If, on the other hand, the debt were not paid but the time of payment was simply extended, then the deed and option may be treated as further security and constituted a mortgage."

The court in the case last above cited, and in *Dickens v. Heston*, 53 Ida. 91, 21 Pac. (2d) 905, 90 A. L. R. 944, followed the doctrine announced in *Ennor v. Thompson*, 46 Ill. 214, thus stated in the syllabus to that case:

"When the mortgagor has conveyed the mortgaged premises to the mortgagee, it only operates as a bar to the equity of redemption, when it clearly and unequivocally appears that both parties so intended it should; otherwise, it will only be regarded as a mere change in the form of the security."

That rule applies with equal force to this case where, by agreement between the mortgagors and the mortgagees by assignment, the land was deeded by a third party, on payment of the purchase price by the mortgagors, to the mortgagees, who gave them an option to purchase by payment of the mortgage indebtedness.

The record in this case discloses it was not the intention of the parties that the debt secured by the first mortgage be paid by the execution and delivery of the deed from Bonner County National Bank to Humbird and the trust company. On the contrary, it shows the mortgage and the note it was given to secure were retained by the assignees thereof to evidence and secure the indebtedness for which they were originally given. The price fixed in the contract, which Samuels was to pay in order to exercise his so-called option, was the exact amount he owed in principal and interest, secured by the first mortgage. These facts raise a strong presumption that the conveyance did not extinguish the debt and that it was intended as a mortgage. (*Investors' Mtg. Security Co. v. Hamilton*, 51 Ida. 113, 4 Pac. (2d) 347; *Dickens v. Heston*, 53 Ida. 91, 21 Pac. (2d) 905, 90 A. L. R. 944.)

That the land was the property of appellants, and that the debt secured by mortgage on it still existed are shown by the provision in the contract that $175, which was to be paid by the state for additional right-of-way, covered by the mortgage, was to be applied on the mortgage debt. It is significant that it is further provided in the contract "the mortgagees will execute partial release and accept a deed from the Bonner County Bank on the foregoing conditions whenever counsel for the mortgagees has advised that a good title, subject only to the mortgage and taxes, is conveyed by the deed from the Bonner County National Bank." The grantees knew the mortgage was not extinguished and that they were taking the deed subject to it.

It is true it is stated in the "Samuels agreement": "H. F. Samuels has no interest, legal or equitable, in the premises, but desires to purchase the property." That he had no interest, legal or equitable, in the premises, is a statement of a conclusion of mixed law and fact. Whether he had or not depends on whether the deed and contract constitute a mortgage, which, in turn, depends on whether the indebtedness from appellants to the grantees named in the deed was paid by the conveyance or whether it still existed and the land still continued to be security for its payment.

It is urged that the debt secured by the first mortgage was paid by the conveyance of the property and, as evidence thereof, the following is quoted from the "Samuels agreement": "This is a unilateral contract and imposes no obligation of payment on Mr. Samuels." His "obligation of payment" was expressed in his note and mortgage, which were retained by Humbird and the trust company.

That it was not the intention of the parties to cancel the mortgage and the debt thereby secured is not only shown by the fact that the grantees in the deed retained the note and mortgage in their possession, but by the following statement in the contract: "It is understood that the deed from the Bonner County Bank to the mortgagees shall not constitute a merger." Discussing that provision of the "Samuels agreement," respondents say in their brief:

"Some emphasis is laid upon the provision that the deed to the mortgagees should not constitute a merger. But this seems to have been very natural under the circumstances. It appears from the record that the mortgagees had other security under their first mortgage, certain Teton coal bonds which were afterwards surrendered to Mr. Samuels, which at that time they apparently preferred to keep as additional security and which would naturally have been released if a merger was effected and the mortgage no longer existed."

It is clear the deeding of the land to Humbird and the trust company did not pay the debt nor release the mortgage which secured its payment. It is also clear it was the intention of the grantees named in the deed to retain all their security, including the land, until the debt was paid. They probably looked upon the debt as being paid when they sold the land

to respondents for money enough to pay it, and thereafter surrendered the note and the pledged Teton coal bonds to Samuels, but that did not extinguish appellants' equity of redemption in the mortgaged land.

The deed and "Samuels agreement" constituted a mortgage subject to I. C. A., section 9–101, which provides:

"There can be but one action for the recovery of any debt, or the enforcement of any right secured by mortgage upon real estate or personal property, which action must be in accordance with the provisions of this chapter."

That chapter relates to foreclosure of mortgages and liens, and that section denies the right to sale of mortgaged land without foreclosure, to satisfy a debt thereby secured.

Respondents have moved to strike from the transcript certain additional findings of fact made and filed by the trial judge subsequently to the entry of the decree. The conclusion which we have reached makes it unnecessary to pass on this motion.

The decree is reversed with direction that findings of fact, conclusions of law and decree be made and entered consistent with the views herein expressed. Costs are awarded to appellants.

Holden and Ailshie, JJ., concur. Budge, J., concurs in the conclusion reached.

Petition for rehearing denied.

GIVENS, J., (Dissenting).—It is only necessary to consider two of the points raised by appellants: First, that because the $1500, sole consideration for the tri-party agreement above set forth, emanated from appellants there ensued a resulting trust in their favor giving them a lien on the property in question, on the theory that where one advances all the purchase price for property with the understanding that he is to have the property or a lien or some interest therein, title though taken in the name of a third person will be held in trust for the person furnishing the consideration, citing *Pittock v. Pittock*, 15 Ida. 426, 98 Pac. 719; *Coughanour v. Grayson*, 19 Ida. 255, 113 Pac. 724; 26 R. C. L. 1219; *Smithsonian Institution v. Meech*, 169 U. S. 398, 18 Sup. Ct. 396, 42 L. ed.

793; *Howe v. Howe,* 199 Mass. 598, 85 N. E. 945, 127 Am. St. 516; and respondents virtually concede that as a general proposition of law the above is correct. As will be noticed from the authorities an essential and pivotal determinative feature is intent of the parties, not only must the purchase price or part thereof be paid by the one for whom the title is taken, though in the name of another, but it must have been the expressed or necessarily implied intention of the parties that title is so taken for the one advancing the money. If the money was advanced for some other purpose a resulting trust would not ensue.

Herein if the tri-party agreement constituted solely an option or right to purchase by appellants in the manner stipulated in the agreement, no resulting trust would follow. The court by his findings and conclusions held it to be an option agreement. If at the time the agreement was made, Humbird and the Spokane and Eastern Trust Co. had absolute title to the land, the $1500 was paid by appellants for the option, not that title should go to Humbird and the Spokane and Eastern Trust Co. to be held for appellants. The mere fact that part of the consideration went to the Bonner County Banks instead of Humbird and the Spokane and Eastern Trust Co. would not change the situation as appellants parted with value, detriment to them, direct benefit to Humbird and the Spokane and Eastern Trust Co. to the extent of $175, and if Humbird and the Spokane and Eastern Trust Co. were willing to grant appellants an option, because of benefit to the Bonner County Banks by payment to them of the $1325, such would not change the transaction from one in the nature of an option to a trust in absence of intention to that effect. (65 C. J. 141, 401; 66 C. J. 488.) The right granted appellants by the agreement, if an option, which the trial court found it to be, was to buy the property on certain installment payments and the $1500 was no part, of the to-be-paid purchase price. The case is thus clearly distinguishable from *Reid v. Keator,* 55 Ida. 172, 39 Pac. (2d) 926, and cases cited and relied upon by appellants.

Appellants' second point is that the agreement constituted an extension or condition of the first mortgage necessitating foreclosure thereof. The answer alleging:

"That any title, right or interest acquired by T. J. Humbird and Spokane and Eastern Trust Company, by virtue of such conveyance from the Bonner County National Bank, was a conveyance to them as trustee for the purpose of carrying into effect said agreement of January, 1935, and to preserve the mortgage held by them separate and apart from any interest that they acquired by such conveyance. That the only interest acquired by the said T. J. Humbird and Spokane and Eastern Trust Company, as trustee for H. C. Culver was that of trustee, a trust resulting by reason of the consideration therefor having been paid by the defendant, H. F. Samuels."

One asserting the transaction to be a mortgage must establish it by clear, satisfactory and convincing evidence. (*Dickens v. Heston*, 53 Ida. 91, 21 Pac. (2d) 905, 90 A. L. R. 944; *Investors' Mortgage Security Co. v. Hamilton*, 51 Ida. 113, 4 Pac. (2d) 347; *Wright v. Rosebaugh*, 46 Ida. 526, 269 Pac. 98; *Clinton v. Utah Const. Co.*, 40 Ida. 659, 237 Pac. 427; *Shaner v. Rathdrum State Bank*, 29 Ida. 576, 161 Pac. 90; *Bergen v. Johnson*, 21 Ida. 619, 123 Pac. 484.)

The agreement itself is capable of more than one construction. The major incidents thereof tending to establish the transaction as a mortgage are: The recital that the deed should not constitute a merger; the option price with interest thereon being identical with the mortgage; the recital in the deed from Humbird and the Spokane and Eastern Trust Company to Jaussaud that:

"In so far as the vendors may or might have any lien against these lands on account of a mortgage executed by H. F. Samuels and Ada J. Samuels, dated February 13, 1928, recorded in Book 20 of Mortgages, page 371, Records of Bonner County, Idaho, such lien is hereby released."

and retention of the mortgage and release thereof at a later date. On the other hand incidents tending to show the transaction to be a deed absolute and option are: The provision that H. F. Samuels has no interest legal or equitable but desires to purchase the property; the right given to Humbird and the Spokane and Eastern Trust Company to lease the premises, with permission given Samuels to occupy part of the premises, whereas if a mortgage he had a right as mortgagor to lease or occupy the whole tract; the declaration that

it was a unilateral contract imposing no obligation of payment on Mr. Samuels, i. e., no continuing debt.

Appellants contend that there was inadequacy of price in that they claim the property to be worth $150,000 or more, that they had invested more than the amount of the mortgage in the property, and they had a chance to sell the property for more than the mortgage and the indebtedness. Closely connected with this incident is the financial condition of the grantors, that is, appellants. The showing in connection with this however and conclusions to be drawn therefrom are conflicting because while appellants take the position that they were hard pressed for money they also urge they were solvent. On the other hand the second mortgage for $10,000 and interest had been foreclosed without appellants redeeming therefrom and apparently being unable to redeem therefrom, nor did appellants make the instalment payment of $10,000 by July, 1936, which would have kept alive their option, or been a payment on the first mortgage. The first mortgage had run since 1929 with only small payments thereon.

On the other hand, respondents or their predecessors in interest, contend appellants were insolvent and unable to respond in damages. If the price was inadequate, the value of the land being much greater, it would tend to show that appellants were not hard pressed, but had potentially a large asset available in the land. However, if the land had but little value and appellants had no other resources, they were hard pressed. Under these circumstances the trial court might have justifiably concluded either way.

The provisions with regard to sale of a portion of land by Humbird and the Spokane and Eastern Trust Co. and that appellants in the exercise of their option could demand conveyance to them only of such land as remained unsold, with credit for whatever amounts might be received therefrom, and any taxes paid by Humbird and the Spokane and Eastern Trust Co. would be included in the purchase price, might support either conclusion that the transaction was a mortgage or option; if a mortgage that appellants were consenting to the sale of their land; if an option that they would not have

the right to demand on the exercise of the option, transfer of all original property.

There was no direct testimony that it was the intention of any or all of the parties to the tri-party agreement that it was to be a continuation of the first mortgage.

Giving full and complete consideration therefore to the determinative circumstances enumerated in *Dickens v. Heston, supra,* there was substantial evidence or lack of substantial evidence, depending upon the viewpoint, to support the negatively expressed finding of the trial court that the transaction did not constitute a mortgage, and the judgment should be affirmed.