No. 38,245

In re: THE RENO COUNTY COMMUNITY HOSPITAL ASSOCIATION, INC., a Corporation, *Appellee*, v. THE ESTATE OF LAURA C. WOODFORD, Deceased, *Appellant*.

(229 P. 2d 730)

Opinion filed April 7, 1951.

*Max Wyman,* of Hutchinson, argued the cause, and *Don Wyman,* of Hutchinson, was with him on the briefs for the appellant.

*C. William Miller,* of Hutchinson, argued the cause, and *Donald C. Martindell, William D. P. Carey, Wesley E. Brown, Edwin B. Brabets, Robert J. Gilliland, John F. Hayes* and *Robert C. Martindell,* all of Hutchinson, were with him on the briefs for the appellee.

The opinion of the court was delivered by

THIELE, J.: This appeal arises out of a proceeding originally commenced in the probate court for the allowance of a demand.

The petition for allowance of the demand alleged that the Reno County Community Hospital Association, a corporation under the laws of this state, hereafter referred to as the Association, was organized for the purpose of conducting a campaign to raise funds in the amount of $600,000 for the construction of additions to Grace Hospital and St. Elizabeth's Hospital in the City of Hutchinson and that subscriptions in excess of $500,000 had been obtained; that large subscriptions were solicited from a number of individuals for memorials and that Laura C. Woodford, deceased, was solicited; that after a number of conferences Laura C. Woodford entered into an oral agreement of subscription to the Association by the terms of which, for and in consideration of the gifts of others, she agreed to and did subscribe and promise to pay to the Association the sum of $25,000 which was to constitute a valid claim against her estate and was to be paid out of her estate after her death, such sum to be for the use and benefit of the Grace Hospital and School of Nursing, a corporation of Hutchinson, and hereafter referred to as Grace Hospital, and as part of the funds to increase hospital facilities in Hutchinson and as payment or reimbursement to Grace Hospital for the cost of such enlargement and improvement to the extent of $25,000, and particularly with respect to the construction of the lobby in Grace Hospital as the same was to be constructed, that such sum of $25,000 should not be payable during the lifetime of Laura C. Woodford, but should be payable upon her death and from her estate, with provision that she could take care of the payment by her last will and testament. The association further alleged at length that in consideration of the above it and Grace Hospital agreed that the plans for extension and improvement of Grace Hospital should proceed as though the subscription were a cash contribution, and that a designated memorial plaque should be placed in the lobby of Grace Hospital. It was further alleged that

prior to the time the oral subscription and agreement were made a proposed draft of an agreement to be entered into was drawn which was acceptable to Laura C. Woodford except as to one paragraph; that a substitute paragraph was agreed upon and a new draft made and when prepared Laura C. Woodford, the Association and Grace Hospital would sign the prepared draft; that before the subscription and agreement were finally prepared and ready for signing Laura C. Woodford was taken to Grace Hospital where she died before the prepared written agreement, which embodied the terms of the oral agreement, was signed; that Laura C. Woodford died intestate and petitioner is entitled to have its claim allowed against the estate of Laura C. Woodford in the amount of $25,000 and interest at four per cent from the date of her death. The prayer was in accordance.

The American National Bank of Hutchinson, administrator of the estate of Laura C. Woodford, filed its answer denying the allegations of the petition, and alleging it had no knowledge of the purported facts stated and requested that the petitioner be put to full proof.

The probate court heard the matter and allowed the claim, and the administrator appealed to the district court.

In the district court it was stipulated that the hearing should be by the court on the transcript of the testimony taken in the probate court and the exhibits in evidence in that court. Thereafter the parties filed briefs and later the trial court made findings of fact and conclusions of law and 'rendered judgment in favor of the claimant Association. Briefly stated, the trial court concluded as a matter of law that V. M. Wiley, hereafter mentioned, was the authorized agent of the Association, to accept the terms agreed upon between him and Laura C. Woodford and that there was a meeting of minds between them. The administrator's motion for a new trial was denied and in due time it appealed to this court, specifying error in the allowance of the claim and that it should have been disallowed for the reason the evidence showed no oral contract of subscription was made or contemplated; that the contract which was being negotiated was never executed by Laura C. Woodford in the form of an offer nor accepted by either the Association or Grace Hospital, and that the contract was testamentary in character and never having been executed as a will, was of no force or effect.

We first note that in support of the judgment in its favor, appellee makes repeated references in its brief to the findings of fact made by the trial court and contends that such findings and the evidence on which they were based, support its contention that a valid oral contract of subscription was entered into between Laura C. Woodford and the Association, which was irrevocable at the time of her death, and that the postponement of payment of the amount subscribed until the death of Laura C. Woodford did not render the subscription agreement testamentary in character. All of the details of the argument based on the findings of fact are supported by citation of authorities tending, at least generally, to support the contentions made.

Appellant, however, directs attention to the fact that the trial in the district court was had upon a transcript of the testimony taken in the probate court and upon the exhibits introduced in evidence in that court, and directing our attention to the rule that where the controlling evidence on issues of fact is written, documentary in character or in the form of depositions or transcripts, it is the responsibility of this court to decide what the facts establish, substantially as it would in an original action (citing *In re Estate of Kemper,* 157 Kan. 727, Syl. § 1, and p. 734, 145 P. 2d 103; see also *Shriver v. Besse,* 163 Kan. 402, 405, 183 P. 2d 407; *In re Estate of Besse,* 163 Kan. 413, 417, 183 P. 2d 414; *Dennett v. Meredith,* 168 Kan. 58, 62, 211 P. 2d 117; and *In re Estate of Davis,* 168 Kan. 314, 318, 212 P. 2d 343, and cases cited), contends that it is the duty of this court to examine the evidence and reach its own conclusion as to what that evidence established. We have no doubt as to the rule stated and it will be followed.

Although limits of space prevent recital of all details, the evidence as abstracted discloses the following: There are two hospitals in the City of Hutchinson—Grace Hospital and School of Nursing, operated by the Methodist Church and Associated Protestant Church organizations, and St. Elizabeth Hospital, operated by the Catholic Church organization. These hospitals were in need of funds for additional buildings and facilities and under an agreement, the exact nature of which was not disclosed, Reno County Hospital Association, Inc., was chartered in 1946 for the purpose of raising funds by subscriptions, gifts, bequests and devises for either or both of the above hospitals. The Association had a board of directors and appointed a number of committees to advance its purposes. V. M. Wiley was appointed chairman of a memorial

gifts committee which sought gifts or subscriptions of $1,000 or more. By action of the board of directors of the Association Mr. Wiley was given power to accept subscriptions upon such terms and conditions as in his judgment he should deem proper, and to make such agreements as he should deem proper with respect to the use of the funds subscribed and the application of such funds and memorials in either hospital to which they might be assigned. By action of the board of directors Roy C. Davis, an attorney of Hutchinson, was appointed as legal counsel. Under the plans followed donors could designate their gifts to either hospital. In taking subscriptions more than one form was used.

Mr. Wiley was given the name of Laura C. Woodford who was a member of the board of directors of the Association and talked to her in the fall of 1946 about a memorial gift honoring her deceased husband and a gift of $25,000 and a memorial plaque were discussed. Mrs. Woodford stated at that time that if she did such a thing she would prefer doing it at Grace Hospital, but that she did not want to sign any paper that would prevent her transferring her property or making a trust or doing anything she wanted with her estate, and after a long discussion Wiley suggested she go to see Roy Davis and have him see what could be done to enable her to make the gift without entangling her estate or preventing her from doing anything she wanted to do. Later he met Mrs. Woodford at the office of Davis and the three of them discussed plans by which she might make the gift and have the plaque placed in the lobby of the hospital. At that time a gift of $35,000 was mentioned.

Mrs. Woodford first talked to Roy Davis in November of 1946 and stated she had talked to Wiley; that she had in mind making a $25,000 subscription, but she did not want it to be due until her death; that she also had in mind creating a trust for charity or for scholarships for high school boys and girls and she wanted to know from Davis how a subscription would work out in that connection. Davis discussed the plaque with her and the architect was asked to prepare a sketch. About this time Davis prepared a form of subscription agreement. When Mrs. Woodford saw this form she objected to it and it was destroyed when Davis shortly after January 16, 1947, prepared a second draft, which was received in evidence. Summarized, this draft, which contained four unnumbered paragraphs, recited (1) That in consideration of the gifts of others and the acceptance of the terms thereof by the Association

that (2) Mrs. Woodford agreed to and did subscribe to the Association the aggregate sum of $_____, which sum of $_____ should constitute a claim against her estate and be paid out of her estate after her death, to be for the use of Grace Hospital and as payment or reimbursement of Grace Hospital for the cost of enlargement and improvement, particularly with respect to the construction of the lobby of Grace Hospital as the same would be constructed, and that the said sum of $_____ should not become due or payable during the lifetime of Laura C. Woodford but should become due and payable as follows: (3) Upon the decease and death of Laura C. Woodford, provided that if she left a will creating a trust of not less than $150,000, the first net income should be used to discharge her obligation until the amount thereof, with interest at four per cent from date of her death, should be paid. Other extensive provisions of this paragraph need not be set forth. (4) In consideration of the foregoing the Association and Grace Hospital, which by its acceptance would become a party, agreed to proceed with the improvement and complete the same as though the subscription was a cash contribution and that a memorial tablet or plaque of stated size and lettering should be placed in the lobby of Grace Hospital. The witnessing clause stated that Laura C. Woodford affixed her signature on the _____ day of _____, 1947, "to be and become effective, binding and irrevocable upon the acceptance hereof by said The Reno County Community Hospital Association and said The Grace Hospital and School of Nursing." Immediately below the line left for Laura C. Woodford's signature was a paragraph to be signed by two witnesses to Mrs. Woodford's signature which stated the witnesses signed at the request and in the presence of Mrs. Woodford. Below were two forms reading, "This agreement is hereby accepted this _____ day of _____, 1947." The first was to be signed by the Association, the second by the Grace Hospital.

On February 17, 1947, there was a conference at Davis's office at which Mrs. Woodford, Wiley and Davis were present. Mrs. Woodford objected to the third paragraph of the proposed agreement and it was stated by Davis that it could be stated that the sum was payable after death of Mrs. Woodford and interest at four per cent, and Mrs. Woodford said that was exactly the way she wanted it and Wiley said it was satisfactory to him; by that time it was after five o'clock and Davis's secretary had left and he told Wiley and Mrs. Woodford he would make a change in the draft the first thing

in the morning. After Mrs. Woodford and Wiley left, Davis wrote out in longhand the proposed change. The next morning Mrs. Woodford came to the office of Davis before the redraft was completed and he read his longhand memorandum to her and she stated that was the way she wanted it. She also made similar statements to Davis's secretary. He asked her if she could wait until it was typed and she said she had an appointment and would not wait but that she would come back that afternoon or the next morning. Mrs. Woodford did not return. That evening she suffered a coronary occlusion, and was taken to Grace Hospital, and was unconscious until her death a few days later.

The redraft of the above mentioned subscription agreement was in all particulars the same as the agreement prepared shortly after January 16, 1947, except that the blanks in the second paragraph were filled in to show $25,000 and the third paragraph was changed to show, in substance, that the sum was due from Mrs. Woodford's estate upon her decease but that she retained the right by will to provide for deferred or installment payments, which should bear interest at four per cent from date of her decease, and among other things that the purpose of the provision was that she should not be hampered or restricted in making disposition of her property by a will which provided for the payment of the subscription in some manner other than as a claim payable in cash during the administration of her estate. There was no evidence that prior to Mrs. Woodford's death Mr. Wiley ever saw or approved either the memorandum made by Davis or the last draft of the subscription agreement.

We note that among the exhibits offered was a letter written by "Laura" to Minnie K. White under date of December 16, 1946, in which she stated she was making a Christmas thank offering of $25,000 to Grace Hospital as a memorial to "Charlie" her husband, as well as a letter found after her death, lying sealed on a table in her home, addressed to a friend, bearing no date, in which she mentioned the hospital drive and "I gave $25,000 for a Memorial for Mr. Woodford." Other exhibits show that Grace Hospital and School of Nursing is a corporation not for profit, with thirty-three trustees, and that the minutes of a meeting of the executive committee of the board of trustees of August 28, 1947, show adopting of a resolution which in a "whereas" paragraph, contained a summarized statement as to the Laura C. Woodford agreement, and

resolved that the Association and Mr. Wiley as chairman of a committee were authorized to make the agreement, "such as has been exhibited at this meeting, the same having been reduced to writing, but not executed;" and that the acts of the Association and Wiley in making the agreement were ratified and approved and Grace Hospital agreed to do and perform the duties and obligations to be performed by it under the agreement.

In a negative way it may be said there is no evidence that the board of trustees of Grace Hospital ever authorized Wiley to act for it in any way whatever or that it saw any of the proposed subscription agreements, or consented to any of their terms during the lifetime of Laura C. Woodford, nor is there any showing that Grace Hospital did anything by way of improvement on the strength of any negotiations at any time prior to her death, or that it has since done anything further than to adopt the above mentioned resolution. And as to that resolution there is no showing of any power in the Executive Committee to adopt any resolutions for or in lieu of action by the Board.

Questions concerning benefits to a charitable organization have been considered by this court on numerous occasions as is evidenced by *In re Estate of Yale*, 164 Kan. 670, 191 P. 2d 906, and *In re Estate of Brown*, 159 Kan. 408, 155 P. 2d 445, where the benefits were attempted to be conferred by checks which were not honored and paid during the lifetime of the makers where the claims were denied, by subscription agreements to endowment or other funds, which were upheld in *Southwestern College v. Hawley*, 144 Kan. 652, 62 P. 2d 850, and *Cotner College v. Hyland*, 133 Kan. 322, 299 Pac. 607, by contract as was disapproved in *In re Estate of Smith*, 162 Kan. 215, 174 P. 2d 1012, and by other means as shown by cases cited in those above mentioned. In some of the above cases mention is made of the rule that benefits to charitable uses have always been favorites of the law, and that courts have been liberal in the construction of any instruments conferring such benefits because they are calculated to foster and encourage charities, whether religious, educational or for the advancement of the public good. While our consideration of the evidence is measured by the above rule, it is always to be remembered that the facts must make it appear that the donor of such benefits not only had the intention to give but translated that intention by effective action, or stated another way, intention alone is not sufficient, the donor must have so acted that he bound himself or his estate.

It is clear from the evidence that Laura C. Woodford made no gift *inter vivos* to the Association for although intention by the donor to give money may have been shown, there was no delivery to the donee, the transaction remained in an executory stage and no title passed. See *In re Estate of Yale* and *In re Estate of Brown, supra,* and also *In re Estate of Baumstimler,* 159 Kan. 316, 153 P. 2d 927, which did not involve a gift to charity but did define the requisites of a gift *inter vivos.*

The case at bar presents the primary question whether Laura C. Woodford, in her lifetime made an enforceable oral subscription, under the circumstances detailed above. We need not devote any time or space to a discussion whether, other things being found, there was sufficient consideration for the subscription, or whether a subscription having been made, it was void as not being timely accepted, or whether for any reason her proposed benefaction was testamentary in character. The question is whether she made a subscription at all.

The Association contends that the evidence was ample to prove that the minds of the contracting parties met as to all of the essential elements of the contract at the conference in the office of Davis on the afternoon of February 17, 1947, and therefore the oral contract of subscription was in all respects valid, and that it was not necessary as a condition of enforceability that it be reduced to writing and executed by the parties, and in support our attention is directed to *Babbit v. Insurance Co.,* 93 Kan. 564, 144 Pac. 837; *Stull v. Burdett,* 110 Kan. 393, 395, 204 Pac. 1005; *Mentzer Bush & Co. v. School Book Comm.,* 142 Kan. 442, 446, 49 P. 2d 969; Restatement, Contracts, § 26; 13 C. J. 289, 303; 17 C. J. S. 410 and other authorities where enforceability of an oral contract agreed upon before a written contract is executed, is treated. Discussion of the above authorities need not be had if we conclude that the parties intended there should be no binding contract until the agreements made were reduced to writing and executed by the parties.

A careful consideration of the evidence summarized above leads to the following conclusions: In soliciting subscriptions generally, more than one written form was being used. At the very inception of the solicitation of Mrs. Woodford by Mr. Wiley, she made it clear she would not sign any subscription paper that would prevent her transferring property and creating a trust or doing what she wanted with her property; that she did not intend to make an out

and out subscription and at the suggestion of Mr. Wiley she discussed the matter with Mr. Davis who prepared a written contract with which she was not satisfied. A second written contract was prepared, and a mere reading of it discloses that she intended to make a donation or subscription under terms and conditions, which to say the least, were not usual, and that it contained provisions for written acceptance by the Association and by Grace Hospital. We are of the opinion that no one at this stage supposed that Mrs. Woodford would have been bound had she said the contract was in proper and suitable form and she would execute it the following day and then have refused to do so. However, she was not satisfied with a particular paragraph and at a subsequent time and on February 17, 1947, she had a conference with Mr. Wiley and Mr. Davis in which the paragraph to which she objected was discussed and in which she stated that if certain changes were made it would be satisfactory. It is to be born in mind that up to this time, each suggestion for a subscription contemplated a written contract, and two such documents had been prepared. The first one is not shown, but the second one explicitly provided for consent and agreement by the Association and Grace Hospital and expressly provided the contract was not effective until so accepted. On that afternoon Mr. Wiley, who represented only the Association, expressed oral agreement with the suggested changes. Owing to the lateness of the hour it was not feasible to have the proposed contract redrafted on February 17, 1947, and it was understood that a redraft would be made and Mrs. Woodford would return the next day. It is clear that at that time neither Wiley, Davis nor Mrs. Woodford considered that a contract had been made or that signing was a mere formality. When Mrs. Woodford returned to Davis's office the next morning she did read Mr. Davis's redraft of the one paragraph but the contract had not been redrawn. She left, stating she would return and sign the redrawn written agreement, which would have been an utterly useless thing to do, if as the claimant Association now asserts, the contract was orally agreed upon and concluded on February 17, 1947. Taken altogether, the very facts cry out that no one, Wiley, Davis or Mrs. Woodford, thought on the afternoon of February 17, 1947, that their conversations had resulted in a valid, enforceable oral contract of subscription. We are of the opinion that what transpired shows clearly that Mrs. Woodford did not intend nor consider that she had bound herself to the Association

in any sum whatever under any condition until the proposed contract had been signed by her and by the proper officers of the Association and Grace Hospital, nor that Mr. Wiley or Mr. Davis thought otherwise. Indeed, language in the Association's verified claim is that it was agreed the objectionable paragraph would be stricken, the pencilled draft substituted and "that when prepared as agreed to by the Parties, said Laura C. Woodford and Petitioner and the Grace Hospital and School of Nursing would sign the prepared draft." In our opinion the various conversations between Mrs. Woodford and Wiley, between her and Davis, and when the three were together for the last time on February 17, 1947, taken into consideration with the drafts of proposed contracts previously submitted to her, were preliminary only to the execution of a written contract, and that until its terms were fully agreed upon and the contract signed, not only by her but by the Association and Grace Hospital, she was not bound.

Were we to agree with the Association's contention that the parties intended that the rather complex provisions embodied in the written draft were concluded and a final contract perfected by the oral statements made in the afternoon of February 17, 1947, we would still be confronted with the fact that such a contract was one between Laura C. Woodford and the Association for moneys to be used in making improvements at Grace Hospital, and even though it be conceded that Mrs. Woodford for herself and Mr. Wiley for the Association were in agreement, the same claimed contract was one which required the concurrence of Grace Hospital, and there is no evidence whatever that at that time it agreed to anything. The evidence shows no more than that Mrs. Woodford was willing to promise to pay $25,000 on condition—it was an offer which, if ever accepted, was by the belated acceptance by an Executive Committee of the Board of Trustees of Grace Hospital, whose authority might possibly be assumed, but which was not shown.

In view of what has been concluded it becomes unnecessary to discuss the appellant's contention that under the terms of the written contract the proposed benefit was testamentary in character.

The judgment of the trial court allowing the Association's demand is reversed and the cause remanded with instructions to render judgment denying it.