252 P.2d 518

SACCOMANO et al. v. NORTH IDAHO SHINGLE CO., Inc., et al.

No. 7846.

Supreme Court of Idaho.

Dec. 10, 1952.

Rehearing Denied Jan. 27, 1953.

McNaughton & Sanderson, Coeur d'Alene, Bandelin, Bandelin & Ponack, Sandpoint, Edmund T. Brigham, Newport, Wash., for appellants.

Stephen Bistline, Raymond T. Greene, Jr., Hardy C. Lyons, Sandpoint, Jack Furey, Challis, for respondents.

Paul W. Hyatt, Lewiston, for respondents on petition for rehearing.

GIVENS, Chief Justice.

The North Idaho Shingle Company, Inc., an Idaho corporation, owning a quiescent shingle mill and its two-acre site in Section 1, Township 56 North, Range 5 West of the Boise Meridian, about four miles north of the town of Priest River in Bonner County, in March 1949, was in straitened financial difficulties.

Edmund T. Brigham of Newport, Washington, as attorney for the Company, apparently had endeavored to have the creditors defer action on their claims and consent to some sort of settlement of the affairs of the Company. Evidently such efforts were fruitless and thereupon, March 30, 1949, a meeting was held at the Davenport Hotel in Spokane, Washington, attended by the four appellants, Brigham, John A. Speer, lumber broker of Danville, Illinois, then secretary-treasurer and owner of 3/7 of the capital stock of the Company and formerly exercising a great deal of control over the Company, Herb Smith, National, Washington, vice president and former manager, the two in possession of and purportedly owners of the stock of all the other previous stockholders who were connected with various lumber businesses in Illinois.

Of appellants, Philip Naccarato alone had been connected previously with the Company as bookkeeper, and according to Speer, for a short time in 1948, ostensible manager.

Frank Saccomano was in charge of the Luby Bay Lumber Co., another concern in no way connected with the North Idaho Shingle Co., and he testified Philip Naccarato was, subsequent to the meeting, in charge of the affairs of the Company for appellants so far as he was concerned.

Joseph E. Bombino lived in Spokane. Frank Naccarato apparently had a restaurant in Priest River.

■ Appellants and Smith testified in person before the learned trial court, Speer, by deposition. Speer's testimony and the implications to be drawn from it and his position in the Company and interest in the controversy are exceedingly important; therefore, we are not bound by the findings of the trial court as to the meeting in Spokane and its concomitants, but are in as good a position as the learned trial court to evaluate and accord Speer's testimony to the other evidence, oral and documentary. Hale v. McCammon Ditch Co., 72 Idaho 478, 244 P.2d 151; Burns v. Skogstad, 69 Idaho 227 at page 236, 206 P.2d 765; Shead v. Moore, 31 Wash. 283, 71 P. 1010; Empire Ranch & Cattle Co. v. Mason, 22 Colo.App. 612, 126 P. 1129; Empire Ranch & Cattle Co. v. Goodrick, 23 Colo.App. 385, 128 P. 473; Gianella v. Haffner, 93 Colo. 449, 26 P.2d 817; Davidson v. Enfield, 35 N.M. 580, 3 P.2d 979; Sanchez v. Torres, 38 N.M. 556, 37 P.2d 805; In re Jubala's Estate, 40 N.M. 312, 59 P.2d 356; De Pee v. National Life & Accident Ins. Co., 144 Kan. 751, 62 P.2d 923; In re Swisher's Estate, 153 Kan. 401, 110 P.2d 765; In re Kemper's Estate, 157 Kan. 727, 145 P.2d 103; Auger v. Shideler, 23 Wash.2d 505, 161 P.2d 200; Reno County Community Hospital Ass'n v. Woodford's Estate, 171 Kan. 97, 229 P.2d 730.

· Respondents by their amendment after the trial asserted that at this meeting, appellants bought the Company and all the stock therein and the court so found as between the parties; i. e., the corporation and Speer and Smith, but that such sale was void and fraudulent as to the creditors. Our solution appears hereafter.

Following the Spokane meeting, appellants each put up $750 for which they received a thirty-day note secured by real and personal mortgages on the Company property, signed for the Company by Speer and Smith in their official capacities. Appellants signed as sureties on a Company note whereby it borrowed $2,540.06 from the Bonner County National Bank and the resultant $5,540.06 was forthwith paid to the Company and by it to the Federal and ultimately State Governments for income and unemployment compensation taxes, which were delinquent and enforcement of which was immediately impending.

■ June 7, 1949, appellants started foreclosure proceedings on the $3,000 note, and on a note given Speer by the Company to pay a previous judgment of Vic Henry (later the cause of action on this note was dismissed) and in connection therewith, one G. L. Gardner, cashier of the Bonner County National Bank, was appointed receiver. The Company at that time additionally owed a note of $11,788 to the Bank, secured by real and chattel mortgages on Company property, and unsecured claims

of $17,000 or upwards. Gardner took the oath of office as receiver, but otherwise never qualified or functioned, being excused from giving a bond because of the Bank's interest through its mortgages. This omission was wrong. A receiver's responsibility is personal, 75 C.J.S., Receivers, § 190, p. 837, and he represents generally all parties. 75 C.J.S., Receivers, § 325, p. 1000. The Bank was not the only creditor. How could it be held for derelictions of the receiver unless it was particeps criminis? Through Gardner's efforts for it, its notes were paid by appellants, and perforce, it washed its hands of the whole matter. Gardner should have been required to give a bond. He persuaded appellants to buy the two notes due the Bank on the representation their second mortgage and their liability on the note they had signed as sureties, would be bettered. Thereupon, he left, and has ever since remained out of, the State.

Through an informal, oral, extra-judicial arrangement between Gardner and the attorney for the Bank, who was also attorney for appellants, appellants were placed in possession of the property and proceeded to operate it, after the court had expressly ordered at the time of the appointment of the receiver, that the plant should not be operated. Dalliba v. Winschell, 11 Idaho 364, 82 P. 107; 75 C.J.S., Receivers, § 183, p. 829.

Appellants continued in possession until January, 1951, by which time they had secured a decree in foreclosure and order of sale. Other creditors at that time filed claims, asked that the first receiver, Gardner, be ousted and another receiver be appointed. The sale was postponed. Thereupon, extended and extensive hearings were had; various pleadings and traverses were filed. At the conclusion of the testimony, the new receiver, who was appointed January 31, 1951, asked to have his pleadings amended to conform to the proof and, in substance, charged appellants with extensive conspiracy, fraud and concealment against the Company's creditors and the court, in taking over and operating the property.

The court found and concluded with regard to the sale of the corporation as above noted, that appellants had been guilty of fraud, conspiracy and concealment; cancelled their mortgages on the theory that as owners of the Company, when they paid the Bank and took the two mortgages, they thereby paid the mortgages, and the one due them was liquidated; ordered the property sold and, if necessary, a personal deficiency entered against them up to $30,-000, and that they pay all costs of the receivership. The appeal is from that decree.

The record in this case is voluminous and heterogeneous. We believe a detailed recitation of the chronological events is not necessary and would serve no useful purpose, and that a condensed consideration of the essential features is sufficient.

Many other incidents elaborated and stressed need not be and are not considered, discussed, or passed upon.

The second receiver, Speer, and Henson one of the other original stockholders in the Corporation, testifying by deposition, sought to show appellants were the aggressors in connection with the meeting at Spokane and placed the onus on them for liability in all the subsequent transactions.

A careful and thorough analysis of the record convinces us there was no completed agreement to sell either the corporation or its stock to appellants, or that any such projected sale was consummated; furthermore, that appellants were not the aggressors, but apparently an attempt was made to unload on them a defunct corporation.

■ There was no concealment as to the foreclosure proceedings and the appointment of the first receiver, because they were matters of public record. Appellants could not get control of the corporation by taking the $3,000 note and securing mortgages, or foreclosure, because under the foreclosure sale the property could be bought by anyone. There is neither allegation nor proof that they intended to suppress bidding at the sale, which never took place. The $3,000 and $2,540.06 loans paid taxes, thereby preserving the Company's property and if the property did not sell for more than enough to pay these mortgages, the Company and its creditors were in no worse position than if the property had been seized and disposed of to pay the delinquent taxes. U.S.C.A. Title 26, § 276(c); Section 72-1355 Idaho Code.

There was no concealment from the court at the foreclosure trial of their purchase of the Company, because they had not bought it. There was no evidence that any claimed fraud or concealment resulted in damage to any creditor. There is no evidence that any creditor changed his position because of appellants' occupancy or operation of the mill, and there was nothing secret about their operation. True, they operated as though they owned the mill, but they did not thereby, so far as the record shows, cause any creditor to change his position to his detriment.

When the hearings began in January, 1951, the court immediately learned of appellants' possession and operation of the mill and upon the second receiver being appointed, appellants willingly turned over to him the mill property and a Cletrac tractor and a jammer, then snowbound in the woods, which belonged to the Company and appellants had possessed and used; thus, at that time the situation was right back where it was in June, 1949; namely, the property of the Company was in the hands of a receiver, available for sale and disposition of the proceeds to the creditors. Except for the lapse of time, no damage to the creditors by reason of appellants' possession of the mill has been shown and the creditors were in no way hindered from

filing or prosecuting their claims, and two of them, Perin and Bombino (not one of appellants) had recovered judgments in the interim and filed claims thereon as did another unsecured creditor. The property in law was in the hands of the receiver for the court. 75 C.J.S., Receivers, § 104, p. 747.

■ Both the evidence and admissions of appellants in their pleadings and by their counsel, show they were in possession of the mill and its property without legal right from June, 1949, to January, 1951, and they offered to pay rent. The first receiver was derelict, through the attorney for appellants and the Bank, in turning over the property to appellants for them to operate in direct violation of the court's order, and appellants should not ·have so taken the property and operated it. They are responsible to the creditors of the Company for this illegal possession and operation of the property in three particulars:

First, for the reasonable rental value of the property. 65 C.J. 143, § 245(3); 53 Am.Jur. 903, § 114.

Second, for any decrease in value of the property of the corporation during that period of time. 65 C.J. 147–8, § 271, n. 4; 53 Am.Jur. 903, § 114.

Third, for an accounting to the receiver and for the value, with interest, of any equipment, property or material belonging to the Company or which they acquired by contracts for raw material made by the Company prior to the receivership and which they have not or cannot return to the receiver. Commercial Standard Ins. Co. v. Remay, 58 Idaho 302, 72 P.2d 859; 120 A.L.R. 1, § 6; 65 C.J. 131, § 247.

■ Appellants are not entitled to any credit for expenses in the management of the mill, Ashworth v. Fleenor, 178 Va. 104, 16 S.E.2d 309, since they operated it without legal right and retained whatever profit they made and did not care for it merely as caretakers. No debts incurred by them while operating the mill are chargeable against the Company or its property.

The decree is, therefore, reversed and the cause remanded with directions to the trial court:

First, to restore appellants' mortgages which they purchased or paid as sureties, also the decree of foreclosure as a determination of their rights under ·the mortgage covered thereby, subject to its relative priority and satisfaction out of the sale of the Company's assets by the receiver.

Second, to ascertain the reasonable rental value of the mill and its equipment, including the tractor and jammer, for the period of time they were in possession of appellants.

Third, to determine the value of the mill and its equipment and the tractor and jammer possessed and used by appellants;

in June, 1949, and in January, 1951. If the value in 1951 is less than the value in 1949, appellants are liable for the difference. If it is worth more, the difference is to inure to the benefit of the creditors.

Fourth, to have appellants account and pay to the receiver for all raw material or property belonging to the Company which they took when they went into possession of the mill in June, 1949, or acquired under its contracts and have not turned or cannot turn over to the receiver.

The decree was signed August 9 and filed August 15, 1951. September 20, same year, the receiver asserting that the assets of the Company were reasonably worth $30,000 and claims of creditors filed to date amounted to $17,000—this, of course, excluded the mortgage held by appellants of $11,788 purchased from the Bank, $3,000 borrowed directly by appellants to pay the taxes, and $2,540.06 for which they were sureties and which they had purchased—asked for receiver's fees for present and prospective services in the sum of $4,000 and attorney's fees of $13,000 for services rendered to date and prospectively on appeal. Objections were made, hearing had and the court, the same day, awarded receiver's fees in the sum of $2,500 and attorney's fees in the sum of $10,000, reciting as follows:

"* * * and the Court being of the opinion that the best interests of sound judicial administration will be best served by setting the fees of the Receiver and his counsel at this time, where the plaintiffs are at this time taking an appeal to the Supreme Court, and seemingly all matters of possible controversy should now be determined in the first instance in this District Court, * * *."

 It is thus apparent the court contemplated this matter should be considered by this Court in the event of an appeal. We recognize the commendable zeal with which the attorney for the receiver has pursued appellants and endeavored to gain assets for the creditors, but the fees to a receiver and his attorney are to be measured by the reasonable value of the services rendered, which encompasses consideration of many factors, including the size of the estate, 75 C.J.S., Receivers, § 389, p. 1062, and the results of the litigation. 75 C.J.S., Receivers, § 389, p. 1066; 45 Am.Jur. 223, § 288.

The total of the receiver's and attorney's fees, the Bank's mortgage which appellants purchased, the $2,540.06 mortgage they purchased, which with the $3,000 mortgage paid taxes, the judgment claims of Perin for $1,150.63 and Bombino (not one of appellants) for $513.56, is $31,492.-25. The assets of the corporation were asserted by the receiver to be worth $30,-000.

 This analysis of the situation leads inevitably to the conclusion that, under the circumstances, the receiver's and attor-

ney's fees are excessive, and since the decree is reversed, should be reduced.

Costs to appellants.

PORTER, TAYLOR, THOMAS and KEETON, JJ., concur.

On Petition for Rehearing

GIVENS, Justice.

Our announcement of independent and appellate appraisal of the deposition of Speer with the oral testimony of the others at the Davenport meeting was confined to what transpired there, and in principle is sustained by the authorities heretofore cited and the discrimination in such pronouncement has in effect been heretofore followed. Whicher v. Delaware Mines Corp., 52 Idaho 304 at page 319, 15 P.2d 610; Cannon v. Seyboldt, 55 Idaho 796 at page 800, 48 P.2d 406; Jaussaud v. Samuels, 58 Idaho 191 at page 201, 71 P.2d 426.

■ Appellants, Brigham and Smith, all testified no final agreement was reached at that meeting. Respondents contend Smith was impeached or his declaration there was no agreement was overcome by a letter detailing an agreement had been reached. The letter, however, as proof of such, stated:

"In accordance with your desire, I am writing this letter to inform and acquaint you with a certain meeting which took place at the Davenport

Hotel in Spokane, Washington approximately the evening of the 29th or 30th of March, 1949.

"There were present at this meeting:
J. A. Spear, Danville, Illinois
Phil Naccarato, Priest River, Idaho
Frank Naccarato, Priest River, Idaho
Joe Bombino, Spokane, Washington
Frank Saccimono, Spokane, Washington
Attorney Edwin T. Brigham, Newport, Washington

"I, Herb Smith, and J. A. Spear attended this meeting for the purpose of representing the interest of the North Idaho Shingle Mill, Inc.

"For purposes of describing this meeting, J. A. Spear and Herb Smith, representing the interests of the North Idaho Shingle Mill, Inc., will be referred to as the party of the first part and Frank Naccarato, Phil Naccarato, Joe Bombino, and Frank Saccimono will be referred to as representing the interests of the party of the second part.

"As described above, the party of the first part and the party of the second part made an agreement whereby a transfer of all of the interests of the North Idaho Shingle Mill, Inc., by the present stockholders was made to the

party of the second part with certain conditions attached.

"These conditions were as follows: The party of the second part agreed to assume all outstanding liabilities of the North Idaho Shingle Mill, Inc. Each individual composing the party of the second part agreed to assume these outstanding obligations both jointly and severally and were so advised by Attorney Edwin T. Brigham that they were assuming these liabilities jointly and severally and that any creditor of the North Idaho Shingle Mill, Inc., shown in the liabilities and schedules of the financial statement of A. F. Talbott, a Certified Public Accountant of Seattle, Washington could look to all or any one of them for full payment of their accounts.

"Attorney Edwin T. Brigham was then authorized to draw up this agreement as proposed and agreed upon by the parties of the first and second parts which he did at his office at Newport, Washington. This agreement was then presented to J. A. Spear and Herb Smith who signed the same for the party of the first part and was then presented to Phil Naccarato, Frank Naccarato, Joe Bombino, and Frank Saccimono, each of whom signed the same for the party of the second part."

\*　　\*　　\*　　\*　　\*　　\*

s/ Herb Smith"

No such or any agreement was ever reduced to writing or signed by any of the parties.

If the trial court considered the testimony of appellants and Brigham and/or Smith was all false, such would not convert their testimony into affirmative proof there was a sale to and with appellants, assumption of personal liability for the already incurred indebtedness of the corporation, and agreement to personally pay the same up to $30,000. Marovich v. Central California Traction Co., 191 Cal. 295, 216 P. 595 at page 600, #7; Cross v. Albee, 250 Mass. 170, 145 N.E. 45.

Subsequent events and transactions clearly show a continual series of negotiations, shifting of positions, and that no definite, certain agreement had been made at the Davenport meeting or subsequently entered into.

A scrambled series of negotiations and partial, but divergent expressions of what the parties had in mind, and inconclusive performance of parties show no definite meeting of the minds, which is an elementary condition precedent of a binding contract.

Respondents continually urge appellants' possession of the mill resulted in fraud and loss to the creditors, but do not show by the record where there was any loss. The property is available now as at the beginning of the controversy by sale to liquidate the claims to the extent of its value. Appellants' mortgages are all for

money advanced to protect the property, not for their individual or collective enrichment.

Our decision imposes full liability for all their acts in connection with the unauthorized possession and operation of the mill. This is all that the entire record and equity and good conscience justify.

The petition for rehearing is denied.

PORTER, C. J., and TAYLOR, THOMAS and KEETON, JJ., concur.