[No. 29313. *En Banc.* October 26, 1944.]

GEORGE WALKER, *Appellant*, v. CASCADE MILK PRODUCTS COMPANY, *Respondent*.[1]

[1]Reported in 152 P. (2d) 603.

 

*J. P. Tonkoff*, for appellant.

*Bonsted & Nichoson*, for respondent.

MILLARD, J.—This is an action in conversion. The cause was tried to the court sitting with a jury. At the conclusion of plaintiff's evidence, the court granted defendant's motion for nonsuit and thereafter entered judgment of dismissal. Plaintiff appealed.

That there was neither evidence nor reasonable inference from evidence of any act of conversion on the part of respondent at any time is clear from the record before us, which we summarize as follows: Under date of October 26, 1942, appellant executed a promissory note in the amount of $1,430.18, payable on demand to respondent corporation at the Yakima branch of the Seattle-First National Bank. Appellant executed the same date a chattel mortgage covering certain cattle and other property to secure payment of the demand note. The mortgage, which specified method of payment and provides for future advances of money to the mortgagor—as a result of which advances the mortgagor was indebted to the mortgagee in a sum in excess of $1,500, March 2, 1943—contains the following provisions:

"As security for the payment to the said mortgagee, its successors and assigns, of the principal sum of One Thousand, Four Hundred, Thirty and 18/100 dollars with interest thereon at the rate of 8 per cent., per annum, according to the terms and conditions of that certain promissory note executed by the mortgagor to the said mortgagee, bearing date October 26, 1942, payable as hereinafter stated, as well as to secure any future advances made by the said mortgagee, its successors or assigns, to the said mortgagor, not to exceed the sum of $————, and as security for any renewal or renewals of the aforesaid promissory note.

"The principal of the above mentioned note, and all interest to accrue thereon, shall be payable in monthly installments, from 50% per cent of the proceeds of all milk and/or cream sold and delivered each and every month to

said mortgagee at places of delivery specified by it, beginning on the 26 day of October, 1942, and continuing until said principal sum and accrued interest, and all other sums secured by this mortgage, with like rate of interest, have been fully paid and discharged.

" . . . that said mortgagee, or its agents, shall at all times have free access to all of said property for the purpose of examining the same and ascertaining its condition; that the mortgagor will immediately report to the mortgagee any loss or injury resulting thereto; and that in case any of the representations or agreements herein contained shall prove to be false or untrue, or in case of failure to pay any part of the principal sum secured by this mortgage, or the interest thereon, at the time specified in said original note or any renewal or renewals thereof, and all other sums secured by this mortgage, or if said property, or any part thereof, be removed from said County or in any way interfered with or molested, or if the mortgagor fails to properly feed, care for and maintain said milch cows, and other property, or fail, refuse or neglect to deliver his milk and cream products to the mortgagee, or sell and dispose of his dairy herd and discontinue the production of milk and cream for sale purposes at any time prior to the full payment of the aforesaid promissory note, or any renewal or renewals thereof, and/or all or any sums secured by this mortgage, or if the mortgagee shall from any cause at any time deem the debt mentioned in this mortgage insecure, or shall believe that the mortgaged property will be lost, destroyed or removed, or if at any time it shall choose so to do, then the mortgagee, its successors or assigns, may declare the whole sum secured by this mortgage to be immediately due and payable, may immediately enter upon the premises where the mortgaged property may be and immediately take possession thereof, using all necessary force so to do, and remove and sell the same in the manner now, or which may hereafter be, provided by law, . . ."

Appellant and his wife, who occupied a tract of land near the town of Toppenish, had transacted business with respondent for about six years. Respondent made loans of money during that period to appellant, who delivered the milk from his dairy to respondent, to which he had continuously been indebted. In the fall of 1942, when appellant needed additional money with which to purchase a truck, he borrowed that money from respondent and executed a

new note and mortgage described above, which incorporated a sum appellant owed respondent represented by a previously executed note and mortgage. February 26, 1943, appellant visited respondent's president, one S. J. Simonson, advising the latter that appellant was dissatisfied with dairying in Yakima county and had arranged to move to Glenwood in Klickitat county.

While it is argued by his counsel that appellant advised respondent's representative at that time that arrangements had been made to pay the mortgagor's indebtedness to the mortgagee, there is no evidence, nor reasonable inference from evidence, that such arrangements were ever made. Appellant testified that respondent's president advised him it was necessary to pay off the obligation; that appellant could send respondent every other check received from the proceeds from the milk after appellant moved to Klickitat county; and that respondent's representative advanced to appellant fifty dollars to assist him in moving to Klickitat county. Appellant admitted, however, that he was to be permitted to remove cattle from Yakima county only after execution of another mortgage.

Appellant next day started for Glenwood with two truck loads of his property. March 1, 1943, appellant returned to Toppenish, having left one of the trucks, which had lost a rear wheel, on the highway. He found his cattle in Toppenish in good condition and the same day, after securing parts for the disabled truck, repaired the truck and arrived at Glenwood March 2, 1943. Two days later he returned to Toppenish and discovered that respondent had commenced proceedings to foreclose the chattel mortgage, at which time appellant retained his present attorney.

March 1, 1943, a field man for respondent went to appellant's home—the dairy farm near Toppenish—for the purpose of having Walker execute a new note and a chattel mortgage for Klickitat county, for the reason that appellant had previously informed respondent's representative of appellant's intention to move to Klickitat county. Appellant and his wife were absent. The cattle were on the highway, the fences were down, and some of the cattle were on other

farms. There was no feed on the place for the cattle, some of which were dead and some were weak. This field man got the cattle back on appellant's dairy farm and then arranged with a neighboring rancher to provide hay for the cattle. The field man returned to appellant's dairy farm early the next morning, but appellant was still absent. Some of the cattle were in the road and no one was available to care for them.

The field man returned to Yakima before noon of March 2nd, reported conditions to respondent's president, and respondent commenced foreclosure of the chattel mortgage by notice and sale under the provisions of Rem. Rev. Stat., § 1104 [P. C. § 9751] *et seq.* The sheriff placed his deputy in charge of the foreclosure. The deputy sheriff took possession of the cattle and machinery covered by the chattel mortgage and placed them on the Worrell ranch, where they were kept during the course of the next few days. No representative of respondent ever took any cattle off of appellant's farm.

Appellant and his attorney went to the office of respondent's attorney March 3rd, where they met respondent's president, who refused appellant's request to be permitted to take the cattle to Klickitat county, where, it was claimed, he could get the money with which to pay the mortgage. Appellant admitted that, at the time respondent's representative advanced fifty dollars to him and expressed a willingness to permit appellant to take the cattle over to Klickitat county, this was conditioned upon appellant's giving a mortgage on the property in Klickitat county. Walker then advised respondent's president he would attempt to raise the money. He was unsuccessful in his endeavors to obtain a loan. Appellant then visited a Mr. Bemis in Yakima county and informed him of his plight. Bemis told appellant he did not lend money on cattle; that all he did was to buy and sell cattle. Bemis sent his agent, a Mr. Larson, accompanied by appellant, to Worrell's place to look at the cattle. Larson and appellant returned to Yakima, but on the way thereto stopped at the home of Mr. Bemis. Larson went into the house of Mr. Bemis, where he remained ten or fifteen

minutes, then came out of the house, rejoined appellant, and they together proceeded to Yakima where they had dinner and then went to the office of appellant's counsel. Larson and appellant's counsel then went to the office of respondent's counsel, and then the two returned to the office of appellant's counsel where appellant was waiting.

While Larson and appellant's counsel were in the office of respondent's counsel, Larson gave to respondent's counsel the check of Mr. Bemis in the amount of $1,650, which was the amount owing at that time by appellant to respondent. After delivery by Larson of the check of Mr. Bemis to respondent's counsel, Larson and appellant's counsel returned, as stated above, to the office of appellant's counsel. Appellant then left the office of his counsel and accompanied Larson to Worrell's place where the cattle and other equipment covered by the mortgage were. Appellant helped Larson load the cattle onto a truck belonging to appellant, and together those two delivered the cattle to Mr. Bemis. Appellant admitted that he knew before he went with Larson to move the property that he was informed by his counsel that Larson had delivered the check of Mr. Bemis to counsel for respondent in payment of the amount due from appellant to respondent. In fact, counsel for appellant admitted in open court that he knew that Bemis owned the cattle at the time Larson and appellant delivered same to Mr. Bemis; that, "I handled that deal personally, through Mr. Bonsted and myself. They were disposed of, sold or whatever you want to call it."

Counsel for appellant further admitted that respondent's counsel told him, when the check of Mr. Bemis, in payment for the mortgaged property, was accepted by respondent's counsel, that the latter told appellant's counsel that respondent could not pass title, could only give to appellant an assignment of the mortgage, "and you took the mortgage." Appellant's counsel admitted that he was so informed by respondent's counsel and did not deny, although he insisted that respondent still retained the note and mortgage, that appellant was given an assignment of the mortgage.

The record is clear that appellant mortgagor, advised by competent counsel and fully apprised of his rights, sold and personally delivered the mortgaged property to Bemis.

■ Conversion is defined in *Phillipos v. Mihran*, 38 Wash. 402, 80 Pac. 527, as any unauthorized act which deprives a man of his property permanently.

■ There is no evidence that, at any time prior to commencement of action of foreclosure under Rem. Rev. Stat., § 1104 *et seq.*, respondent mortgagee exercised any dominion or control over appellant's property constituting a conversion within the meaning of the foregoing definition. The amount of the mortgage was then due. The advance by respondent of fifty dollars to appellant did not suspend terms of the demand note. There was not any consideration for the alleged extension, as there was no benefit to creditor who advanced the fifty dollars and certainly no detriment to appellant debtor who received the fifty dollars.

When respondent's representative went to appellant's dairy farm March 1st for the purpose of having a new note and mortgage signed and while there fed the cattle and returned them to appellant's farm, no act of conversion was committed. Respondent preserved the property and in no manner deprived appellant of his property.

■ ■ Commencement of the action by respondent for collection by foreclosure of amount of demand note did not constitute conversion. The bringing of the action was a sufficient demand for payment. While there was a collateral agreement (quoted above) or mortgage providing the method of payment of the note which conflicted with the provisions of the demand note, the terms of the note govern.

The note was payable on demand at a specified place; therefore, respondent had the legal right to proceed as it did, and this without making previous demand for payment upon appellant, who was maker of the note. There was no question of fact to submit to a jury. There is nothing even *cousin-germaine* to evidence to sustain the contention of modification of terms of payment. As stated above, the ad-

vance by respondent to appellant of fifty dollars did not suspend terms of the demand note.

The judgment is affirmed.

SIMPSON, C. J., BEALS, STEINERT, and GRADY, JJ., concur.

MALLERY, J. (dissenting)—The appellant gave the respondent a demand promissory note and secured it by an installment chattel mortgage. Desiring to remove the chattels from the county, the appellant consulted the respondent about the matter. The respondent loaned him fifty dollars with which to move, and they agreed upon the terms of a new installment chattel mortgage which was to be executed. The respondent prepared the new mortgage but never presented it to the appellant for execution.

During the absence of the appellant occasioned by the moving of some of his other property out of the county, the respondent began foreclosure proceedings of his chattel mortgage by notice and sale, and incident thereto caused the sheriff, as his agent, to take possession of the chattels.

It is immaterial, so far as the law of this case is concerned, whether the negotiations for new chattel mortgage constituted an oral modification of the existing one or not, for the reason that the existing chattel mortgage, as well as the one contemplated, provided for installment payments. In any event, neither were delinquent or due. The chattels had not been removed from the county and the respondent did not feel himself insecure or attempt to invoke the insecurity clause of the mortgage. He acted upon the theory that he had a right under the mortgage to foreclose at any time because the promissory note was a demand note. He did not make a demand on the note nor begin an action thereon.

The respondent's position is clearly stated in its brief. I quote:

"The ultimate conclusion to be drawn from the record in this case is that Simonson did nothing prior to the commencement of the foreclosure proceeding which amounted to depriving Walker of the mortgaged property. Because Walker's note to Simonson was a demand note payable at the bank, Simonson had the right at all times to institute foreclosure proceeding. This right did not depend upon the

insecurity clause in the mortgage, but rather upon the fact that the obligation was presently due and unpaid. It follows, therefore, that Simonson could not be guilty of conversion by commencing the foreclosure proceeding, Walker himself sold and disposed of the mortgaged property and caused the proceeds of the sale to be applied to the mortgage indebtedness and the expenses of foreclosure. In view of these facts, it clearly appears from the record, that there can be no basis for Walker's contention that Simonson is guilty of conversion."

In another place, the respondent states in its brief:

"From these it clearly appears that the basis of Simonson's right to foreclosure is the promissory note which was payable on demand at the Yakima Branch of the Seattle-First National Bank."

Upon the appellant's return, he learned of the respondent's possession of the chattels and demanded the same. Respondent refused him possession of them. This constituted conversion, unless, of course, respondent had a right to foreclose its mortgage. The majority opinion confirms its right so to do. I quote:

"The note was payable on demand at a specified place; therefore, respondent had the legal right to proceed as it did, and this without making previous demand for payment upon appellant, who was maker of the note."

I cannot agree that it is the law that a mortgage can be foreclosed in violation of its terms. I am unaware of any case that permitted it. It is true that, where a demand promissory note is secured by an installment chattel mortgage, action may be brought at any time on the note. The terms of the installment mortgage, though not in default, will not constitute a defense to the action on the demand note. But that certainly does not mean that the demand note makes the mortgage itself due and actionable. In the action on the demand note, the plaintiff is relegated to his provisional remedies and may not claim a lien, as such, free from the provisions of the exemption statutes. Lien rights may be secured, if the mortgagee desires them, by proceedings on the mortgage and the foreclosure must be governed by its terms. Can it be doubted that an action to foreclose

an installment mortgage, in default, would lie even though given as security for a time note not yet due?

Courts do not make contracts and will not prevent the parties from making their own by arbitrarily refusing to give effect to their clear intention. There is no legal inconsistency that makes it impossible for parties, in one transaction, to provide for alternative courses of action. They can agree upon any kind of a promissory note they choose and, in an action thereon, are controlled by its terms. At the same time they can agree upon a lien and fix the terms thereof and, in an action to foreclose, its terms likewise govern. When the parties have expressed a clear intention so to do, what right has a court to say that they are not permitted to do so, or to say that their intention is different from that which was clearly expressed? The respondent had no right to foreclose the mortgage. I quote again from the majority opinion:

"The record is clear that appellant mortgagor, advised by competent counsel and fully apprised of his rights, sold and personally delivered the mortgaged property to Bemis."

As of the time the sheriff took possession of the chattels, there was either a conversion or there was not a conversion, depending upon whether the demand feature of the note is controlling in an action on the installment mortgage. If there was a conversion, the question of whether or not some subsequent act of the appellant aborted it, is not before this court for the conclusive reason that waiver or estoppel were not pleaded and are therefore unavailable as defenses to the respondent. Furthermore, if either waiver or estoppel were an issue in the case (which they are not), the issue would be for the jury to decide, unless, of course, we are prepared to hold that it was established as a *matter of law*. In view of the fact that everything the appellant did was, in the contemplation of both parties, subject to the dominion of the respondent over the chattels; that the respondent never released or intended to release the chattels, conditionally or otherwise, to the appellant; and that respondent received the entire selling price, it would have been a jury question, if it had been in the case. I do not think a conversion is

waived as a *matter of law* because an owner, faced with a forced sale, takes an interest in the selling price of the chattels in order to escape a deficiency judgment when his acts are subject to the possessory rights claimed by the mortgagee.

The judgment should be reversed and the cause remanded for trial.

BLAKE, ROBINSON, and JEFFERS, JJ., concur with MALLERY, J.

