451 P.2d 519

E. Virgil ADAIR and Norma Adair,
Plaintiffs-Respondents,

v.

W. E. FREEMAN, Delphia Freeman, Wallace R. Egland, Kathleen Egland and Kenneth Poe, Defendants-Appellants.

No. 10171.

Supreme Court of Idaho.

March 6, 1969.

Rehearing Denied April 1, 1969.

Rapaich & Knutson, Lewiston, for defendants-appellants.

J. H. Felton, Lewiston, for plaintiffs-respondents.

McFADDEN, Justice.

On November 1, 1961, Mr. and Mrs. E. Virgil Adair, plaintiffs-respondents, leased the second floor dining room area of the City-County Airport Building in Lewiston, Idaho from the City of Lewiston and Nez Perce County. This lease was to terminate December 31, 1966, but contained an optional renewal clause for an additional term. The Adairs operated the Tailwind Restaurant on these premises until August 1965, when with the lessors' consent they assigned the lease to Mr. and Mrs. James L. Brush.

Brushes purchased the assets of the restaurant as a going business for $25,000, paying Adairs $10,000 cash and giving Adairs a note and mortgage for the balance of $15,000. The Brushes raised the $10,000 cash payment by a loan of that amount from Mr. and Mrs. W. E. Freeman, defendants and appellants. The Brushes, Adairs and Freemans agreed that the Freemans would have their loan evidenced by Brushes' promissory note to them, secured by a first mortgage on the property of the restaurant, including all equipment, stock in trade, fixtures, and beer and liquor licenses issued by the City, County and State. On August 25, 1967 the Brushes executed the notes and chattel mortgages to the Freemans and Adairs, in accordance with the agreement, the Freemans' mortgage being a first chattel mortgage and Adairs' mortgage being junior and secondary to Freemans'. Both chattel mortgages itemized the personal property and specifically described the various beer and liquor licenses as being covered by the mortgage. The first mortgage to the Freemans was in customary terms and after providing for foreclosure in event of breach of its terms by non-payment of the note, then contained a provision that before the Freemans exercised any of the options for foreclosure, they were to serve the Adairs, personally or by mail, a written notice specifying the default of the Brushes, and "requiring compliance with the terms of this mortgage within thirty days * * *." The Freemans also agreed that if the Adairs com-

plied with the notice and terms of the mortgage the default would be deemed corrected, but if they did not comply within the thirty day period the Freemans could proceed with the foreclosure.

Brush then opened and operated the restaurant, and after obtaining necessary beer and liquor licenses, opened the Regal Lounge on the same premises and in conjunction with the Tailwind Cafe, purchasing under a conditional sales contract other equipment not involved herein. Brush encountered financial difficulties and requested Freeman to reduce the monthly payments provided on his note from $400.00 per month to $200.00 per month, which request was granted on May 13, 1966, with Adairs' consent. This did not alleviate Brush's problems and on August 19, 1966 he contacted Freeman for the purpose of turning all the property over to him. At this time, while not in default, Brush owed $7,457.00 on the Freeman note and mortgage, and $13,233.68 on the Adair note and mortgage.

On August 31, 1966, Freeman purchased for $1.00 all the Brushes' interest in the property, including all licenses. This transfer was specifically made subject to the Adair mortgage. On September 16, 1966, Freemans, by their attorney, notified the Adairs' attorney of the purchase from Brush and gave Adairs thirty days within which to pay the balance due on the first mortgage. This notice was purportedly in compliance with the provisions for notice in the first mortgage of Brushes to the Freemans.

Pursuant to the agreement of sale between Brush and Freeman, Freeman paid Brush for his stock of merchandise and liquor and obtained the keys to the premises. Freeman gave one set of keys to the airport manager, who, without the consent of either Freeman or Adair, let defendant Kenneth Poe and Mr. and Mrs. Wallace R. Egland into possession of the premises and the mortgaged property.

On the same day that the agreement between Brush and Freeman was executed (August 31, 1966), the Lewiston City Manager, purporting to act for the City and County, gave written notice to Adair and Brush that the lease was terminated and that $2900.00 in rentals were past due from Brush. Another notice was served on Freeman and Adair to remove all the mortgaged property from the premises. On September 25, 1966, the City issued a notice of a hearing to revoke Brushes' beer license.

The Adairs did not pay the balance due from Brush to Freeman on the first mortgage within the thirty days mentioned in the notice by Freeman. Under date of October 24, 1966, the Freemans entered into a conditional sales contract with Mr. and Mrs. Wallace R. Egland, defendants-appellants, and Kenneth Poe, an unmarried man, pursuant to which the Freemans sold to Egland and Poe, without mention of the Adair mortgage, all the equipment, fixtures, and beer and liquor licenses of the Tailwind Cafe, for the agreed price of $8,302.41, payable in monthly installments. The sale price exceeded the balance due from Brush to Freeman on the first mortgage. Both the Eglands and Poe knew of the existence of the Adair chattel mortgage at the time they entered into this agreement. Egland and Poe later obtained a new lease on the airport premises and obtained new liquor and beer licenses, for the balance of that year, with Freeman paying one-half of the fees.

The Adairs instituted this action on November 29, 1966, alleging a conversion of the mortgaged assets by the Freemans, the Eglands and Poe, all of whom were named as defendants. The defendants moved for summary judgment which the court denied, and the case came on for trial before the court in September 1967. Subsequently findings of fact, conclusions of law and judgment were entered in favor of the Adairs. The trial court concluded that the Freemans, instead of foreclosing their mortgage, took over the property in an unauthorized manner and were liable for the conversion. The court also concluded that Eglands and Poe, in purchasing the prop-

erty from Freeman with knowledge of Adairs' mortgage, were equally liable for the conversion. The trial court further found that

"XIII

"On August 31, 1966, which is the date that must be taken for the purpose of determining damages (This being the date that Freeman first took over the property.) all of the mortgaged assets were reasonably worth the sum of $21,-000.00. Deducting therefrom $7,500.00, being the amount of principal and interest owing to Freeman on said date, there remains $13,500.00 which is the amount plaintiffs have been damaged by the conduct of Freeman and the concurring conduct of the defendants, Poe and Egland."

Judgment was entered in favor of Adairs for $13,500.00 and jointly and severally against all defendants, who have appealed from the judgment.

The first issue to be considered is whether the trial court correctly held that Freeman's conduct in purchasing the mortgaged assets from Brush and later selling them to Poe and Egland without first foreclosing his mortgage in the customary method, either by notice and sale or judicial foreclosure, constituted an unlawful conversion.

This court has previously defined "conversion" as an act of dominion wrongfully exerted over the personal property of another in denial or in unwarranted interference with his rights therein. Klam v. Koppel, 63 Idaho 171, 118 P.2d 729 (1941); Schlieff v. Bistline, 52 Idaho 353, 15 P.2d 726 (1932). See also Kee v. Becker, 54 Cal.App.2d 466, 129 P.2d 159 (1942); George W. Brown & Sons State Bank v. Polen, 132 Okl. 121, 270 P. 9 (1928); Watkins v. Layton, 182 Kan. 702, 324 P.2d 130 (1958).

I.C. § 45–1117 provides:

"If the mortgagor of any property mortgaged in pursuance of the provisions of this chapter, while such mortgage remains unsatisfied in whole or in part, wilfully removes from the county or counties where the mortgage is recorded, destroys, conceals, sells or in any manner disposes of, the property mortgaged, or any part thereof, without consent of the holder of said mortgage, he is guilty of larceny, and such sale or transfer is void."

While not discussing the foregoing section, this court has repeatedly held that one who purchases chattel property from the mortgagor, without the consent of the mortgagee, is liable to the mortgagee in conversion for the reasonable value of the property so purchased up to the amount due and unpaid on the mortgage. Adams v. Caldwell Milling and Elevator Co., 33 Idaho 677, 197 P. 723 (1921); Twin Falls Bank & Trust Co. v. Weinberg, 44 Idaho 332, 257 P. 31, 54 A.L.R. 1527 (1927); Smith v. Holmquist, 47 Idaho 611, 277 P. 574 (1929); Bodenhamer v. Pacific Fruit & Produce Co., 50 Idaho 248, 295 P. 243 (1931). Freeman, therefore, in purchasing the mortgaged property from Brush, the mortgagor, without first obtaining the consent of Adair, converted the property and became liable to the Adairs. I.C. § 45–1117 specifically proscribes any sale of mortgaged property by a mortgagor without the consent of the mortgagee.[1] The record in the present case fails to disclose that the Adairs ever consented to the sale to Freeman or to the subsequent sale by Freeman to the Eglands and Poe. Freeman became liable for conversion of the mortgaged property at the time he purchased it from Brush without Adairs' consent. The Eglands and Poe subsequently also became liable when they purchased the property from Freeman,

---

1. I.C. § 45–1117 was repealed by S.L. 1967, ch. 161, § 10–102, effective midnight, December 31, 1967 and was supplanted by the Uniform Commercial Code (I.C. §§ 28–1–101—28–10–104). The decision in the present case is based on the law as it existed in 1966, the Uniform Commercial Code being applicable only "to transactions entered into and events occurring after midnight on December 31, 1967." I.C. § 28–10–101)

knowing of the existence of Adairs' mortgage and without obtaining his consent. United States v. White, 143 F.Supp. 754 (D.C.Idaho 1956); Adams v. Caldwell Milling and Elevator Co., supra; Twin Falls Bank & Trust Co. v. Weinberg, supra; Smith v. Holmquist, supra; Bodenhamer v. Pacific Fruit & Produce Co., supra.

■ Defendants take the position that under the first mortgage executed by the Brushes to Freeman, that the Adairs had thirty days following Freeman's notice to them of his purchase from Brush to redeem the property by paying off the Brush mortgage. Defendants argue that the Adairs, having failed to exercise their rights under this clause of the first mortgage, have no right to complain about the subsequent sale by Freeman to satisfy his mortgage. However, this contention goes beyond the provisions of this first mortgage, which simply provided that in the event of default by the Brushes (mortgagors) in payments to Freeman, before Freemans exercised any of the options for foreclosure, they were to give the Adairs 30 days notice within which time the Adairs could correct the default.

■ The first mortgage does not specify what was to happen should the Adairs fail to redeem a default by Brush. This court, however, has in several instances stated that a mortgagee can recover mortgaged property only in accordance with the statutory form of foreclosure. As this court said in Peterson v. Hailey Nat'l Bank, 51 Idaho 427, 6 P.2d 145 (1931),

"The mortgagee cannot lawfully seize mortgaged property in any other manner than that provided by C.S. § 6380 [a forerunner of I.C. § 45–1109] * * * and when he sells it in any other manner than that directed by statute 'he is guilty of conversion, and becomes liable to the mortgagor, the same as any one else who converts property to his own use.' Marchand v. Ronaghan, 9 Idaho 95, 72 P. 731 * * *."

See also Rein v. Callaway, 7 Idaho 634, 65 P. 63 (1901); Boomer v. Isley, 42 Idaho 547, 246 P. 966, 47 A.L.R. 578 (1926); First Nat'l Bank of Pocatello v. Poling, 42 Idaho 636, 248 P. 19 (1926); Garrett v. Soucie, 46 Idaho 289, 267 P. 1078 (1928); Brockman v. Caviness, 61 Idaho 254, 100 P.2d 946 (1940); Arens v. Scheele, 63 Idaho 189, 119 P.2d 261 (1941); Williamson v. Ysursa, 78 Idaho 423, 305 P.2d 732 (1957).

■ I.C. § 45–1109 thus provides the exclusive methods by which a mortgagee can foreclose his mortgage:

"Any mortgage of personal property, when the debt to secure which the mortgage was given is due, may be foreclosed by notice and sale as hereinafter provided, or it may be foreclosed by action in the district court having jurisdiction in the county in which the property is situated. * * *"

Even though the first mortgage, then, did not specify what was to happen should the Adairs fail to redeem Brushes' default, the Adairs, under the law of this state, could still expect the Freemans to foreclose their mortgage pursuant to law. Instead of proceeding under one of the statutory forms of foreclosure, however, the Freemans assumed full dominion over the property by reason of the sale to the Eglands and Poe. This sale, in denial of the Adairs' mortgage, constituted a conversion. Although Freeman was already guilty of a conversion by virtue of his purchase of the property from Brush without Adairs' consent, this second sale had the effect of making the Eglands and Poe equally liable for the conversion since they purchased the property with knowledge of the Adairs' mortgage. United States v. White, 143 F.Supp. 754 (D.C.Idaho 1956); Adams v. Caldwell Milling and Elevator Co., supra; Twin Falls Bank & Trust Co. v. Weinberg, supra; Smith v. Holmquist, supra; Bodenhamer v. Pacific Fruit & Produce Co., supra.

The defendants contend that a senior mortgagee who receives mortgaged property from the mortgagor in good faith and at a fair price for the purpose of paying

his mortgage is not liable to a junior mortgagee for conversion. Several cases from other jurisdictions are cited by defendants to sustain this proposition: Carity Motors v. Eichten, 189 Minn. 310, 249 N.W. 190 (1933); People's Nat'l Bank of Nocona v. Jones, 34 S.W.2d 346 (Tex.Civ.App.1930); Harris v. Grant, 96 Ga. 211, 23 S.E. 390 (1895). In each of those cases, however, the value of the mortgaged property was less than the amount due on the first mortgage, and therefore the second mortgagee suffered no damages by the first mortgagee's action in selling the property because in any event there would not have been enough equity to satisfy the second mortgage. The main thrust of the decisions relied upon by appellant, then, is not that there was no conversion, but rather that the second mortgagee suffered no damage.

■ Defendants also argue that they took possession of the mortgaged chattels to preserve and protect them and that such an act, being equally beneficial to persons having subordinate rights in the chattels, is not a wrongful conversion. They rely chiefly upon Kertz v. Paris, 168 Cal.App.2d 67, 335 P.2d 154 (1959); Royal Furniture Co. of Baton Rouge, Inc. v. Fillion, 121 So. 2d 259 (La.App.1960); Finance Security Co. v. Stuart, 75 So.2d 353 (La.App.1954); and Walker v. Cascade Milk Products Co., 21 Wash.2d 615, 152 P.2d 603 (1944). The record in the present case, however, does not reveal that the defendants took possession of the chattels only for the purpose of safekeeping, and for that reason it is our opinion that the cases relied upon by appellant are inapposite here.

■■ A final contention by defendants in regard to the conversion issue is that a junior mortgagee cannot recover for conversion unless he can prove that the chattels covered by his mortgage are the identical chattels converted. This point is an accurate statement of the law. Transamerica Corp. v. Merrion, 127 Colo. 100, 255 P.2d 391 (1953); Hanover Nat'l Bank v. Farmers' & Merchants' State Bank, 55 S.D. 598, 227 N.W. 67 (1929). There is, however, sufficient evidence in the record to establish that the property sold by Freeman was the same property on which the Adairs held a second mortgage. This contention, therefore, is without merit.

■ The next issue requires a consideration of the proper measure of damages in this case. It is well settled that upon proof of a conversion by a mortgagee, the injured party can recover the market value of the property converted at the time and place of conversion minus the amount due on prior mortgages. Peterson v. Hailey Nat'l Bank, 51 Idaho 427, 6 P.2d 145 (1921); Gunnell v. Largilliere Co., Bankers, 46 Idaho 551, 269 P. 412 (1928); Vollmer Clearwater Co., Ltd. v. Union Warehouse & Supply Co., Ltd., 43 Idaho 37, 248 P. 865 (1926); Loudon v. Cooper, 3 Wash. 2d 229, 100 P.2d 42 (1940); Erickson v. Carlberg Co., 54 S.D. 296, 223 N.W. 195 (1929). Defendants maintain that the cost of removal of the assets from the cafe should also be deducted from the value of the assets because if Freeman had resorted to foreclosure proceedings such costs would have been incurred. In this regard they rely on Texas Co. v. Sorrell, 116 F.Supp. 137 (D.C.Mont.1953). We have been unable to find any other cases supporting appellant's contention, and disagree with the reasoning in Texas Co. v. Sorrell. It appears from reading that case that the court was influenced by equitable considerations presented by the peculiar fact situation involved there. Moreover, in the present case there was no showing that the property would have had to be removed prior to a foreclosure sale and no property was actually moved. It is our opinion that there would be no justification for allowing appellants to deduct costs not actually incurred and perhaps even unnecessary.

■ Defendants also contend that the court must have included the lease on the premises and the beer and liquor licenses in the property found to be con-

verted since the chattels alone could not be worth $21,000.00. It is their position that inclusion of the lease and licenses was error because the lease and the beer and liquor licenses had been canceled at the time of the conversion. It is our conclusion, however, that this contention is without merit. The record shows that on August 31, 1966 the City of Lewiston notified the Adairs and Brushes that the lease was canceled for default in the payment of rentals and that the City thereby exercised immediately its right of re-entry. Under I.C. § 55–210, however, a right of re-entry can be exercised only after it has accrued and three days' notice has been given to the tenant. The City's purported notice, therefore, was defective in that it did not comply with the statutory requirements and was ineffective as a cancellation of the lease. The district court correctly found that the City and County did not take "proper legal procedure to cancel the lease and the purported cancellation thereof subsequently made was entirely void." The district court could therefore properly consider the value of the lease in assessing damages for the conversion.

 Appellants also contend that it was error for the court to include the value of the beer and liquor licenses for two reasons. First they contend that these licenses were canceled. The record, however, reveals only that a notice was issued by the City informing interested parties that a hearing would be held to consider revocation of the beer license held by Brush. There is no evidence showing that the license was finally canceled. Moreover, there is no evidence that the State ever revoked the state liquor license. Secondly defendants contend that even if the licenses were not canceled and that Freeman purported to transfer them to the Eglands and Poe that such transfer would have had no effect because liquor licenses are not transferable. Defendants have overlooked, however, this court's decision in Schieche v. Pasco, 88 Idaho 36, 395 P.2d 671 (1964), in which we recognized that liquor licenses constitute a property right (Weller v. Hopper, 85 Idaho 386, 379 P.2d 792 (1963)) which can be mortgaged. Schieche v. Pasco, supra, also recognized that mortgaged liquor licenses can be sold during the process of foreclosure. It is our opinion, then, that in the present case Mr. Freeman purchased the interest of Mr. Brush in the liquor licenses in question and then transferred the licenses to the Eglands and Poe without regard to the Adairs' interest under the second mortgage. The value of the licenses was thus properly included in assessing damages for the unlawful conversion.

 The district court's finding that at the time of the conversion the mortgaged property was reasonably worth $21,000.00 is fully sustained by the evidence. Mr. Adair testified that the licenses used in the business were worth approximately $15,000.00 to $18,000.00 and that the chattels were worth roughly $18,000.00 to $20,000.00. Mr. Poe, on the other hand, stated that in his opinion the licenses were worth only $2,900.00 per year and the equipment only $5,500.00 to $6,000.00. Similarly, Mr. Egland testified that the equipment was worth $4,000.00 to $5,000.00 and Mr. White, called as a witness by the defense, valued the chattels at $7,445.00. The district court could have accepted Mr. Adair's valuation of the licenses and the defendants' valuation of the chattels and reached a conclusion that the property was worth $21,000.00. But an even better indication that the district court correctly valued the converted property is the fact that Brush had purchased the identical property only thirteen months previously at a price of $25,000.00. The finding of the trial court on this issue is supported by substantial and competent evidence. It is well settled that under such circumstances this court will not interfere. Fairchild v. Mathews, 91 Idaho 1, 415 P.2d 43 (1966); Riley v. Larson, 91 Idaho 831, 432 P.2d 775 (1967); King v. MacDonald, 90 Idaho 272, 410 P.2d 969 (1965); I.C. § 13–219.

The judgment of the trial court is affirmed.

Costs to respondents.

SMITH, C. J. concurs (concurrence registered prior to retirement).

TAYLOR, J., concurs in the conclusion reached. (TAYLOR, J. called back from retirement).

SPEAR, Justice (dissenting).

By permitting themselves to be led down the primrose path of "conversion" the trial judge and my colleagues, who either authored or concurred in the majority opinion, have transformed a relatively simple relationship between the Adairs, the Brushes, the Freemans, the Eglands and Kenneth Poe into something filled with complexities.

In August 1965, when the Brushes purchased the personal property involved from the Adairs and borrowed $10,000 from the Freemans to make the down payment on such purchase, the relationship of these parties was as follows: the Brushes held the legal title to the property, the Freemans held a first chattel mortgage against this legal title, and the Adairs held a junior or secondary chattel mortgage on the property. The only thing unorthodox or peculiar about this arrangement and these relationships was the provision in Freemans' first mortgage in which the Freemans agreed that before foreclosing such mortgage against the property they were to serve the Adairs, personally or by mail, a written notice specifying the default of the Brushes, and in "requiring compliance with the terms of this mortgage within 30 days * * *." If the Adairs complied with the notice and the terms of the mortgage, the default would be deemed corrected; but if they failed to comply within the 30-day period, it was agreed the Freemans could proceed with the foreclosure. The Brushes became financially embarrassed to the extent that default on the Freeman note and mortgage was imminent, so on August 31, 1966, they sold to the Freemans, for the purchase price of $1.00

"and other good and valuable consideration," all of their legal interest in the property. At this time the equitable interest of Freemans by reason of their first mortgage became merged with the legal title to the property, and the first mortgage, together with the indebtedness it secured, became extinguished and paid—it no longer existed. This undoubtedly was the intent of the parties, i. e., the Brushes and Freemans. See Westheimer v. Thompson, 3 Idaho 560, 32 P. 205 (1893); Toston v. Utah Mtge. Loan Corp., 115 F.2d 560 (9th Cir. 1940); Johansen v. Looney, 31 Idaho 754, 176 P. 778 (1918); Investors' Mortgage Security Co., Ltd. v. Hamilton, 51 Idaho 113, 4 P.2d 347 (1931); Jaussaud v. Samuels, 58 Idaho 191, 71 P.2d 426 (1937).

The agreement between these parties shows this sale and transfer was made for the purpose of avoiding the foreclosure by Freemans against the Brushes under the August 25, 1965 first chattel mortgage. It also specifically recognizes that the Adairs still hold a second mortgage on the same property, and also provides that:

"IT IS FURTHER AGREED by Brush that by this instrument he relinquishes any right, title, interest or equity that he may have in said personal property."

Thus the status between Freemans and Adairs, after this transaction between Brushes and Freemans, placed Freemans as the legal title owners of the personal property subject to what has now become a first mortgage in favor of Adairs, with the Adairs having the further option of bringing the mortgage from Brushes to Freemans to life or reinstatement by paying the defaulted payments on said mortgage within the 30-day period. This they failed and refused to do. By their inaction the Adairs consented to any reasonable course of action on the part of the Freemans which would not be in derogation of their rights or interests. See A. J. Knollin & Co. v. Jones, 7 Idaho 466, 63 P. 638 (1900). Nothing was attempted in derogation of the equitable interest of the Adairs in the sale of the assets by the Brushes to the Free-

mans. To the contrary, the conveyance specifically recognized that the assets were subject to the Adair mortgage. Additionally, the Adairs were informed of the sale and requested to take action to protect their interests. The rule appears to be:

> "Where a mortgagor is rightfully in possession of the property before a forfeiture has occurred, he may sell his interest in it subject to the mortgage; but if he attempts to dispose of the property absolutely to one not affected with notice of the mortgage, and thereby prejudices or defeats the mortgagee's rights, he is liable to the latter in trover. Of course, if the mortgagee consents, the mortgagor may sell the property free from the incumbrance. The consent operates as a waiver of the lien." L. Hammon, A Treatise on Chattel Mortgages, 203–204 (1901).

The majority opinion reaches the conclusion that the sale by the Brushes to the Freemans constituted a "conversion" by relying on I.C. § 45–1117. In my opinion this section is inapplicable to the cause at hand, because (1) by its terms this statute does not apply to a mortga*gee*; and (2) this is a criminal statute providing, in part, that a mortgagor who sells the property or any part thereof without the consent of the holder of the mortgage is guilty of larceny and voids any such sale or transfer. The violation of any criminal statute, requires a *mens rea*, i. e., the act must be wilfully or fraudulently committed with the intent to unlawfully deprive a mortgagee of his rights or interests in the mortgaged property. No such intent is disclosed in the cause on hand, as hereinbefore mentioned, for the Adairs were completely informed of the entire transaction and their rights as holders of a second mortgage protected in every manner.

Additionally, the cases which the majority relies upon, such as Adams v. Caldwell Milling, etc., Co., 33 Idaho 677, 197 P. 723 (1921), are inopposite to the Brush-Freeman sale. Cases such as *Adams* deal only with a sale by the mortgagor to a third person who is otherwise a total stranger to the mortgagor-mortgagee relationship. Consequently, these cases have no significance to the case at bar.

The rule in Idaho is, "conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein. * * *" Klam v. Koppel, 63 Idaho 171, 118 P.2d 729 (1941); Schlieff v. Bistline, 52 Idaho 353, at page 357, 15 P.2d 726 (1932). As previously indicated, nothing was done in the Brush-Freeman sale that could be deemed an action of dominion over Adairs' personal property in denial or inconsistent with his rights—instead, Adairs' rights were fully protected and he was fully informed concerning them—but the Adairs chose to do nothing about it.

Concerning the second sale, i. e., from Freemans to Eglands and Poe, technical conversion could have occurred under the Idaho case law cited by the majority. Again, however, these cases hold that in order for there to be a conversion the sale must be in derogation of the mortagee's rights, such as a sale without giving actual notice of Adairs' equitable rights as a mortgagee. The facts, however, conclusively show that Adairs' mortgage was regularly recorded and therefore Eglands and Poe had constructive notice of those rights. The evidence further discloses that in fact these purchasers had *actual* notice of the existence of the Adairs' mortgage. They bought this property, therefore, completely and fully subject to Adairs' interest therein. In my opinion such notice is inherently inimical to any finding of wrongful domination in derogation of Adairs' rights which is necessary to a conclusion that such sale amounted to a conversion. Eglands and Poe purchased this personal property subject to Adairs' mortgage and upon refusing to comply with the terms of such mortgage Adairs could have foreclosed. This was the proper remedy to have been sought by Adairs instead of the conversion action.

The general rule is that:

> " * * * Where a sale is without a mortgagee's consent, the purchaser is

generally not liable for conversion solely because of the sale itself—that is, he is not liable unless he does some act inimical to the rights of the mortgagee which endangers or destroys the mortgage lien. However, a purchaser with notice of an existing mortgage will be liable for conversion if he assumes entire dominion over the property, using it as his own *in denial of the mortgagee's rights,* or does other acts which amount to an actual conversion, as where he refuses to surrender the property to the mortgagee on demand or comingles it with his own and thus puts it beyond the reach of the mortgagee." (Emphasis supplied). 15 Am.Jur.2d, pp. 325–326 Chattel Mortgages § 156.

The evidence in the case at hand does not bring the Freemans, the Eglands or Poe within this rule as converters.

In my opinion, the reasoning of the majority opinion places an undue burden on business procedures which may reasonably be designed to alleviate the losses which are inherent in mortgage foreclosures. The majority requires foreclosure proceedings, *exclusively,* whenever a mortgagor is unable to maintain his payments on a mortgage. Under this interpretation of the law, a mortgagor is precluded from ever selling his interest to any third person, *even a mortgagee,* though such sale may be in the best interests of all concerned. Additionally, I feel the theory of conversion which is utilized in cases of this nature is both cumbersome and unduly restrictive of commercially accepted practices. Where, as here, a mortgage is regularly recorded, it cannot be denied. When a default occurs, the mortgagor can foreclose on the mortgaged property, no matter in whose hands it might then be. If the property has disappeared or cannot be regularly located, then and only then should an action for conversion lie against the purchaser from the mortgagor.

In any event, whether recovery by the Adairs be allowed on the theory of conversion or on the theory of mortgage fore-closure, they cannot recover judgment beyond the amount actually due or to become due the Adairs on the indebtedness secured by the mortgage when judgment is rendered. Bodenhamer v. Pacific Fruit & Produce Co., 50 Idaho 248, 295 P. 243 (1931); 15 Am.Jur.2d 326, Chattel Mortgages, § 156. In this case the recovery would be limited to $13,233.68 plus interest instead of the $13,500.00 granted by the trial court.

The judgment should be reversed and the cause remanded to the trial court for further proceedings consistent with this opinion.

McQUADE, J., concurs in this dissent.